Whitaker, Judge,
delivered tbe opinion of tbe court:
Plaintiffs sue tbe defendant for just compensation for tbe taking of an easement of flight over their property described in the petition. Defendant admits liability; it is well established ; and tbe sole question before the court is one of just compensation.
The dwelling house on plaintiffs’ property is about 3,750 feet from the north-west end of the northwest-southeast runway at Forbes Air Force Base, near the city of Topeka, Kansas. The property fronts 1,526 feet on U. S. Highway 75. It comprises 107.61 acres, devoted primarily to farming.
The dwelling house sits back from the highway 200 feet. It consists of sis rooms, a rear porch, with a sleeping porch above, and a full basement with concrete floor; it is of frame construction, with stucco exterior, plastered walls and hardwood floors. There is also a frame garage, with composition roof and a concrete floor, with ample space for two automobiles and for the storage of small tools. There is a quon-set implement shed, 32 by 42 feet, with a metal arched roof, concrete floor and concrete foundation. The barn is 26 feet by 70 feet, and has a stock shed attached on two sides. It has a full loft for hay storage, and is equipped with a series of grain bins. All of the buildings are quite old, except for the house, garage, and implement shed.
There is also a trailer court north of the house, consisting of 20 house-trailer spaces. It has concrete walks, septic tanks, electric utility connections, with city water and elec *426 tricity, and a combination bath and laundry building. It sits in a wooded area, providing ample shade.
All the witnesses agreed that the highest and best use of the frontage on Highway 75, extending back 300 feet, is for commercial purposes.
The trial commissioner has found, and we agree, that the highest and best use for the remaining property is for agricultural purposes. Plaintiffs’ witnesses, however, based their valuation of the property on the theory that it was available for subdivision into residential sites. The commissioner concludes, however, that there is no reasonable probability of devoting it to such a use in the foreseeable future. The property lies 1% miles south of the city of Topeka, Kansas, but the growth of the city is in other directions, with little probability in the near future of any growth in the direction of this property. It is true that there is a subdivision to the north of the property, between it and the city of Topeka, but it is a low-cost, emergency subdivision, erected by the Government to take care of people who had been displaced from their homes by a flood in 1951. There are no other housing developments between plaintiffs’ land and the city limits of Topeka.
We see no reasonable probability of plaintiffs’ property being devoted to a housing development at any time in the foreseeable future. We conclude, therefore, that, with the exception of that part of the property fronting on Highway 75 and extending back therefrom for a distance of 300 feet, it can best be utilized for agricultural purposes.
About two-thirds of plaintiffs’ land and all of the land fronting on Highway 75, and the improvements on the property are in the approach zone for aircraft landing on the northwest-southeast runway, and there are from 2,000 to 4,500 flights per month.
About 30 percent of the landings at the Forbes Air Force Base are ground control approach landings, called GCA landings, and 70 percent are visual landings. The GCA glide slope, which means the downward path an airplane is directed to follow when it camiot see the ground and is landing on instruments, passes over plaintiffs’ house at 210.9 feet above the top thereof, 204.5 feet above the top of the barn, *427 and 191.6 feet above the top of the silo. When landing visually, airplanes pass about 300 feet above the structures on plaintiffs’ land. In taking off, the airplanes pass at a height of about 400 feet over plaintiffs’ home.
In addition, there is an absolute minimum glide angle, beginning at the end of the clear zone, 1,000 feet beyond the end of the runway, and rising one foot for every 50 feet along the ground. No structure may be erected above this glide angle. It passes a little over 70 feet above the top of plaintiffs’ house, and about 80 feet above the top of the trailer court, taking into consideration both the distance of the house and the court from the end of the clear zone and also the difference in ground elevations.
This glide angle is not the angle at which planes normally approach the runway. As noted above, the ground control approach passes 210 feet above plaintiffs’ house, instead of 70 feet. The glide angle might be said to be the lowest possible angle at which airplanes can fly in approaching the runway, but an approach at this angle would bring them very low to the ground at quite a distance from the end of the runway, and would be dangerous. It might be said to be the minimum angle of approach with any degree of safety. Airplanes never fly this low unless they are in trouble and cannot help it.
These jet bombers make an almost deafening noise to anyone within their neighborhood. When flying over plaintiffs’ house, no conversation in it is possible. The trial commissioner, at the request of the parties, went to the premises and witnessed the landing of a number of these airplanes. He said they made the loudest noise of any airplane he ever heard. When they pass over the house the windows rattle and the house itself vibrates. The propeller-driven airplanes are not so noisy.
The record shows that from 2,000 to 4,500 flights are made from the Forbes Air Force Base, 60 to 70 percent of which use the northwest-southeast runway, which passes over plaintiffs’ house. The use and enjoyment of plaintiffs’ home was much impaired by these planes passing over it. Plaintiffs, however, have continued to occupy it as their home.
*428 The use and enjoyment of the portion of the land devoted to wholly agricultural use has been impaired very little. The use and enjoyment of the portion whose highest and best use is for commercial purposes has been impaired to some extent, but not so much as plaintiffs’ residence. This is illustrated by what has happened to the plaintiffs’ trailer court. For the first few weeks after airplanes began passing over the trailer court, some of the occupants left, but they soon returned, or others took their places, so that the court is as well occupied today as it was before the advent of the jet bombers.
This is accounted for, in part, by the fact that the proximity of the Forbes Air Force Base has created a greater demand for spaces in the trailer court. Due in large part to the proximity of the Air Force Base, 20,000 automobiles a day pass along Highway 75 in front of plaintiffs’ property. The proximity of this Base has also tended to enhance the value of the other property whose best use is for commercial purposes. It is fair to say, we think, that the detriment to the value of the commercial property by the passage of the planes over it is approximately offset by the enhancement in its value by the proximity of the field. It is the proximity of the field that causes the planes to pass over this property and impair its value, and it is the proximity of the field that creates a greater demand for the property and thus tends to enhance its value. One about offsets the other.
In arriving at just compensation there should be offset against the value of the thing taken and the damage to the remainder whatever enhancement in value may have resulted from the public work requiring the taking. United States v. Miller, 317 U. S. 369, 375, et seq.; Aaronson v. United States, 79 F. 2d 139; United States v. River Rouge Improvement Co., 26, 9 U. S. 411; Reichelderfer v. Quinn, 287 U. S. 315, 323.
Taking all relevant factors into consideration, including the testimony of the expert witnesses, we agree with the commissioner that $15,000 represents just compensation for the diminution in value of the property resulting from the taking of the easement of flight, over and above the enhancement in its value due to the proximity of the Forbes Air Force Base. That easement is the right to fly airplanes of any *429 kind over any part of plaintiffs’ property at an altitude of 70 feet and above. Judgment for that amount is awarded, plus an amount computed tbereon at the rate of four percent per annum from September 1, 1955, to the time of payment, all as just compensation for tlie taking.
Plaintiffs will execute a deed in fee simple conveying to defendant such an easement.
It is so ordered.
Laramore, Judge; Madden, Judge, and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner William E. Day, and the briefs and argument of counsel, makes the finding of fact as follows:
1. The plaintiffs, Ralph and Nellie B. Dick, husband and wife, are residents of the State of Kansas, and are the owners of and reside on a tract of 107.61 acres of land and improvements in section 30, T. 12 S., R. 16 E., 6 P. M., in Shawnee County, Kansas.
2. The plaintiffs’ property is located about 1% miles south of the present city limits of the City of Topeka and about one-half mile north of the northern boundary of Forbes Air Force Base. When purchased by the plaintiffs the property was about three miles south of the city boundary but the city boundary has since been extended. The property is bounded on the west by U. S. Highway 75; on the north by a housing subdivision known as Terra Heights; on the east by the Missouri Pacific Railroad, and on the south by a tract of land belonging to Stanley M. Meyers. The Meyers’ tract in turn adjoins the northern boundary of Forbes Air Force Base.
3. The plaintiffs resided on the premises for several years prior to 1943. In that year they purchased the land and the improvements then in place for $12,000. The improvements consist of a house, garage and farm buildings, including chicken house with cement floor, brooder house, quonset implement shed and milk house, barn and silo. The house is a modern, bungalow-type. It is located about midway in the property along U. S. Highway 75 and is set back about *430 200 feet. It was moved to its present location when Highway 75 was widened and made into a four-lane divided highway. The house consists of six rooms, a sleeping porch above a rear porch, and a full basement with concrete floor. It is of frame construction with stucco exterior, plastered walls and hardwood floors. The garage, which was constructed after the plaintiffs purchased the property, is of frame with a composition roof and concrete floor and provides liberal space for two automobiles and small tool storage.
The quonset implement shed, built in 1950, is 30 feet by 42 feet, is of wood with metal arched roof, concrete floor and concrete foundation.
The barn is 26 feet by 70 feet and has a stock shed attached on two sides. It has a full loft for hay storage, and is equipped with a series of grain bins.
All of the buildings are quite old and have been allowed to run down except the house, garage and implement shed.
To the north of the house is a trailer court consisting of 20 house-trailer spaces. The improvements for the trailer court include concrete walks, septic tanks with drain fields, electric utility connections, and a small combination bath and laundry building. Ample shade is provided by large trees. The plaintiffs’ premises are served by city water and electricity but depend upon septic tanks for disposal of sewage from the home and the trailer court.
4. The plaintiffs performed most of the labor in the construction of the trailer court beginning in 1949. There is no evidence in the record concerning the cost of construction.
5. Forbes Air Force Base is a permanent base and has assigned to it three separate units, which are two tactical wings and the 810th Air Force Group. Each wing is composed of a large number of B-47 and KC-97 aircraft. The 810th Air Force Group is the organization which provides the facilities of the base, which enable the tactical wings to carry out their missions. Forbes Air Force Base is not a flight training base but a considerable amount of training is carried on to maintain and improve pilot proficiency. The pilots assigned are not fledgling pilots who are learning to fly but are pilots who have completed courses at a school of the Air Training Command.
*431 6. When. Forbes Air Force Base was originally constructed, there were three runways, each approximately 6,000 feet in length. There was a north-south runway, a northeast-southwest runway, and a northwest-southeast runway. The use of the northwest-southeast runway was discontinued in 1953 and a new runway, the present northwest-southeast runway, was constructed. The present northwest-southeast runway is approximately 2,000 to 3,000 feet northeast and roughly parallel to the old northwest-southeast runway. It is, however, on a 10° different direction heading.
7. The present northwest-southeast runway is a concrete paved runway, approximately 200 feet wide and 12,800 feet in length. The extended center line of the runway passes south of the house and trailer park and between the dwelling house and the silo. The trailer park is to the north of the plaintiffs’ dwelling house. The present northwest-southeast runway was placed in operation in August 1955. Prior to August 1955 no air traffic from take offs or landings of aircraft at Forbes Air Force Base passed over the plaintiffs’ property. But since August 1955, when the present northwest-southeast runway was placed in operation, approximately 87 percent of all aircraft at the base have used that runway. Almost all (approximately 95.97 percent) of the B-47 jet aircraft use this runway and, in taking off into or landing from the northwest, fly directly over the plaintiffs’ premises.
8. At the request of and accompanied by counsel for the parties, the commissioner made a personal survey of'the plaintiffs’ premises to observe the take offs and landings of Air Force planes. The direction of the wind at that time was such that only landings were observed, the take offs being made in the opposite direction. The B-47 jet bombers came in for landing directly over the plaintiffs’ home making the loudest noise of any airplane he ever heard. It was impossible to carry on any conversation, to hear or be heard, at the time a plane was directly overhead.
9. Air Force Regulation 86-3, which is an installation planning and development regulation, established the planning criteria for Forbes Air Force Base as well as all other Air Force bases. The runways at these bases must be *432 planned and constructed in accordance with, tbe criteria described in Air Force Regulation 86-3. The criteria set up in that regulation require a clear zone, an approach zone as well as a glide angle plane above which all obstructions must be removed.
10. Pursuant to the requirements of Air Force Regulation 86-3, the northwest-southeast runway at Forbes Air Force Base, the paved portion of which is about 200 feet in width and 12,800 feet long, has a clear zone at the end of the runway. The clear zone, as measured on the ground, extends for a distance of 1,000 feet from the end of the runway and 1,000 feet on each side of the center line of the runway as extended, measured from the end of the runway. The clear zone, therefore, is 1,000 feet long, beginning at the end of the runway, and 2,000 feet in width.
The approach zone is that area within imaginary lines extending in a fan-shape from the end of the clear zone outward for a distance of 25,000 feet. The approach zone starts at the end of the clear zone but at the same width as the end of the clear zone, which, as noted, is 2,000 feet in width, and the approach zone then fans out to a width of 4,000 feet at a distance of 10,000 feet from the end of the clear zone. The approach zone then remains constant at 4,000 feet in width for the additional 15,000 feet of length.
Within the first 10,000 feet of the approach zone there is a third dimension, which is a vertical one called the glide angle plane. The glide angle plane starts at the end of the clear zone — 1,000 feet beyond the end of the runway — and is measured at the elevation at the end of the runway. It then extends upward into space on a ratio of 1:50, that is, one foot of elevation for every 50 feet of linear distance.
11. The northwest end of the northwest-southeast runway is about 3,750 feet from the plaintiffs’ dwelling house. The land northwest of the extended center line of the runway slopes away slightly downward so that the surface of the plaintiffs’ entire premises is lower in elevation than the end of the runway. About two-thirds of the plaintiffs’ land and all its improvements are in the approach zone.
The end of the runway is at elevation 1,061.52 feet above mean sea level. Beyond the end of the runway and in direct *433 center, there has been constructed an instrument landing approach system antenna, which electrically produces the center line of the instrument landing approach system, otherwise known as the ILAS. This antenna is approximately 1,475 feet off of the end of the runway toward the plaintiffs’ premises and 425 feet beyond the end of the clear zone of the northwest-southeast runway. The antenna array sits on top of a trestle-like structure. The height of the trestle is approximately seven feet above the elevation of the end of the runway. The elevation of the top of this structure therefore is approximately 1,068 feet MSL. On-top of the trestle-like structure are placed the antennae' themselves, which extend for an additional seven or eight feet. The entire array of antennae, therefore, is approximately 15 feet above the end of the runway.
The structure is approximately 100 feet in width, extending 50 feet on each side of the extended center line. The structure tapers toward the rear so that at the rear it is approximately 25 feet in width.
The top of plaintiffs’ dwelling house is at elevation 1,046 MSL.
The top of plaintiffs’ barn is at elevation 1,045.
The top of plaintiffs’ silo is at elevation 1,025.
The ground level of the trailer court on plaintiffs’ premises is at elevation 1,035.
12. The 50 to 1 glide angle plane is a clearance criteria only, above which all obstructions must fall. There is no relationship between the 50 to 1 glide angle plane and the path of the aircraft in taking off or landing except its requirement for the removal of such obstructions to provide a safety factor. The path of any particular type of aircraft is determined primarily by its own peculiar flight characteristics. For example, the B-47 jet bomber has a rather flat approach angle. Other aircraft have much steeper approach angles. The B-47 approach angle, although it is one of the flattest, is still an angle considerably above the 50 to 1 glide angle. It is conceivable that an aircraft might approach the runway at this glide angle, but if it were to do so at the speeds at which they operate, it would place them very low to the ground at a considerable distance short of the runway so that the landing operation would be dangerous.
*434 13.The B-47 jet bomber is powered by sis very powerful jet engines and is a large, heavy, extremely noisy airplane. Its size, weight and other data are given below:
Wingspan_116 feet
Length_109.8 feet
Tail height_28 feet
Maximum take off weight_ 200,000 pounds
Maximum landing weight_ 180,000 pounds
Basic weight_ 83,190 pounds
14.The KC-97, the fueling plane for the B-47, is a four-engine propeller driven airplane. Though large and heavy, it is not as noisy as the B-47. Its size and weight are given below:
Wing span_141 feet
Tail height_ 47.28 feet
Length_100 feet
Weight_ 80,000 pounds
Loaded weight_ 150,000 pounds
15. The B-47 is a high performance type aircraft and all take offs are planned one day before they are scheduled. The distance required for take offs varies with the weight of the plane, that is, whether loaded or unloaded, and the temperature, the pressure and the elevation of the runway. Fully loaded, in average weather at Forbes Air Force Base, approximately 7,500 to 8,500 feet of runway are required before the B-47 becomes airborne. Occasionally 10,000 feet of runway is required before the B-47 becomes airborne. In warm weather, when longer runway distances would be required, auxiliary power is obtained by the use of water injection, so that the average distance required for take off remains about the same.
Unstick speed, the speed at which the B-47 becomes airborne, is 153 knots per hour. Immediately after leaving the ground, the speed accelerates to 173 knots. The rate of climb is 1,000 to 1,800 feet per minute.
16. In landing onto the northwest-southeast runway, the B-47 airplanes are at a height above plaintiffs’ home which varies with many factors including the personal factor as to each pilot but is about 200 feet when landing under the ground-controlled approach (GCA) and about 300 feet when the landing is made under visual flight rules.
17. Approximately 30 percent of the landings at the air base are GCA landings and 70 percent are visual landings.
*435 18. On take offs from the northwest-southeast runway, the thrust of the B-47 jet engines causes them to create even more noise and vibration than on landing.
19. The B-47 airplanes in taking off over the plaintiffs’ property attain an altitude of about 400 feet at the moment they pass over the plaintiffs’ home.
20. The GCA glide slope, which is computed on an angle of 2V2 degrees from a point 750 feet from the end of the runway, passes over the structures on the plaintiffs’ premises at the following elevations:
210.9 feet above tbe top of tbe plaintiffs’ bouse
204.5 feet above tbe top of the plaintiffs’ barn
191.6 feet above the top of the silo
21. The northwest-southeast runway is the only runway used for take offs and landings of B-47 and KC-97 airplanes at the Forbes Air Force Base. Because of the prevailing winds, approximately 70 percent of all take offs made during the summer months are into the northwest and approximately 30 percent of all landings are made from the northwest over the plaintiffs’ premises. During the winter months, approximately 60 percent of all take offs are made in that direction and approximately 40 percent of all landings are from that direction. Take offs and landings are made into the wind so that when the wind direction requires take offs over the plaintiffs’ property, landings are not made over it but from the opposite direction. Likewise, when landings are made over plaintiffs’ property, take offs are in the opposite direction.
22. No precise record of the number of aircraft taking off from the northwest end of the northwest-southeast runway or landing from the northwest onto the northwest end of that runway has been maintained. Records showing the total number of flights, which include take offs and landings at all runways and to and from all directions, have been maintained. These records show that from 2,000 to 4,500 flights per month are made from and to all runways at Forbes Air Force Base. A flight consists of a take off and a landing.
23. In March of 1956 just after its take off toward the Dick property a RB-47 jet plane lost one motor, the motor *436 falling on the Dick property and scattering pieces of metal over a wide area of the Dick property.
24. At the time the motor fell off the jet plane, Mr. Dick undertook to go over to the place where it had fallen in order to see what damage it may have done to his land, but he was detained by guards from the Air Force base who refused to permit him to go into the area where the motor had fallen.
25. Thereafter one of the Air Force base planes lost a life raft which fell in the barn lot on plaintiffs’ land.
26. The jet planes fly over the home of the plaintiffs daily and at all hours of the night; they are brightly lighted at night and disturb the sleep of plaintiffs, vibrate the house and make a terrific noise.
27. The noise and lights and disturbance of the planes flying over the home of plaintiffs make them nervous and cause them to lose much sleep.
28. It is found as a fact that the disturbance to the peace and quiet of the plaintiffs’ home by the noise, vibration and night lights of the planes taking off and landing directly over it, renders it unfit as ahorne.
29. The B-47 jet bombers and KC-97 tanker planes first began to fly over the plaintiffs’ property in large numbers about September 1, 1955, and have continued to do so and apparently will do so in the future.
30. The total complement of airplanes stationed at Forbes Air Force Base consists of about 60 percent B-47 jet bombers and 40 percent KC-97 tanker planes.
31. On September 1, 1955, and at the time of trial in September 1957, all of the plaintiffs’ property was zoned residential by the Shawnee County authorities. That county began its zoning activities by an ordinance enacted in August 1953.
32. After the trial, the plaintiffs filed application for the change in zoning classification of their property for the entire frontage of 1,526 feet along Highway 75 for a depth of 500 feet east of such highway. The parties have stipulated that on November 25, 1957, the Board of County Commissioners approved the rezoning of such 1,526 feet frontage for a depth of 300 feet. Accordingly, at the present time all *437 of the plaintiffs’ property is now zoned residential except 1,526 feet along Highway 75 for a depth of 300 feet which is zoned for general commercial use.
33. Upon the filing by the parties of a stipulation showing the rezoning action referred to in the preceding finding, proof was re-opened by the commissioner for the purpose of receiving additional evidence concerning value of the plaintiffs’ land as a result of such rezoning action. By letter from counsel for each party, the commissioner was advised that neither party desired to offer additional evidence.
34. In 1955, when the Missouri Pacific Railroad needed some of the plaintiffs’ land to enable it to install a railroad track into Forbes Air Force Base, it paid the plaintiffs $5,300 for 10.6 acres of land. This was at the rate of $500 per acre. That railroad now operates a spur track into the Base and that track abuts the northeast corner of the plaintiffs’ tract of land for a distance of about 1,400 feet.
35. There is no evidence in the record as to the plaintiffs’ income from farm operations either before the planes began to fly over the plaintiffs’ land or afterward. The evidence concerning the income from the operation of the plaintiffs’ trailer court is scanty. There is no direct evidence concerning the plaintiffs’ net income from the trailer court operation. The testimony concerning earnings there is to the effect that each trailer court rents for $20 per month, and there are 20 spaces, so that when all are rented the gross earnings are $400 per month. The plaintiffs testified that due to the flight of planes vacancies have resulted. There is no satisfactory evidence concerning the extent of the vacancies or of the expenses incident to the operation of the trailer court. Mr. Dick did testify that when the jet planes first started to fly over his property there were eight vacancies but his testimony is equivocal concerning the extent of vacancies after September 1,1955.
36. At the time of the trial, in September 1957, practically the entire frontage along Highway 75 between Topeka and the plaintiffs’ land was being used for some business purpose and was zoned for such use. Land on the east side of Highway 75 in the immediate vicinity of the plaintiffs’ land is more desirable for commercial use than land on the west side *438 because tbe main line of the Santa Fe Railroad generally parallels that highway on the west side at distances which vary from 250 or 300 feet to considerably less than those distances.
. 37. In 1943, when the plaintiffs purchased the property, and until 1949, it was used exclusively for farming purposes and was equipped with the farm buildings and the dwelling house. In 1947, the State of Kansas purchased a portion of the land fronting U. S. Highway 75 for a depth of 75 feet. The plaintiffs were paid $5,300 as compensation for that portion of the land and that sum included compensation for moving the dwelling house about 200 feet to its present location.
The U. S. Highway was then widened and since about 1947 has been a four-lane divided highway extending south from the City of Topeka for a distance beyond Forbes Air Force Base.
In 1943, when the plaintiffs purchased their property, the northern boundary of the Forbes Air Force Base was about 1% miles due south of the plaintiffs’ southern boundary. In 1949, the plaintiffs began the construction of a trailer park to accommodate 20 trailers. In 1955, the plaintiffs sold 10.6 acres along the northeast corner of their property to the Missouri Pacific Railroad. The railroad required that portion for the construction of a right-of-way from Topeka to serve the Forbes Air Force Base. After the trailer court operation began, Mr. Dick continued to farm the balance of his land and has raised wheat, alfalfa, corn, oats, hay and broom grass. Although there was some testimony concerning cattle, it appears that most, if not all, of the pasture which the plaintiffs utilized was on rented land nearby. No cattle have been raised since 1955 but it is not clear from the evidence whether this was due to the flight of planes or from market conditions generally.
The plaintiffs’ premises are about five miles south of the business district of Topeka. The premises are about 1% miles south of the present city limits, and about 1% miles south of the point on U. S. Highway 75 where the Kansas Turnpike overpass is located.
*439 38. The expansion of the Forbes Air Force Base to accommodate the flight of jet planes, and the operation of the Supply Depot in conjunction with it, has generally enhanced the value of the plaintiffs’ land in an undetermined amount. In addition, the location of the Missouri Pacific spur track along the northeast corner of the plaintiffs’ land enhances it because of a remote possibility of use for industrial purposes in the future. Approximately 20,000 automobiles per day travel along Highway Y5 in front of the plaintiffs’ property.
The enhancement in the value of plaintiffs’ land by reason of the proximity of the Forbes Air Force Base approximates the impairment in value of it resulting from the easement of flight taken by defendant.
39. Four well qualified valuation experts testified as to the valuation of the property immediately before the flights of jet planes over the plaintiffs’ property began and the value immediately thereafter; these experts were Bobert Taggart and Frank Faust on behalf of plaintiffs and W. L. Hamilton’ and William J. Harrington on behalf of defendant.
40. The testimony of the experts concerning the value just prior to September 1,1955, which was taken as the date of the flight of the jet planes in large numbers and the value after the flight of planes, is given below:
For plaintiff: Before After
Taggart_ $93,700 $41, 700
Faust_ 200, 000 60, 360
For defendant:
Hamilton 72,100 58,500
Harrington. 72, 670 63,200
41. Their testimony differed with regard to highest and best use from commercial use along the highway with the balance for residential development to farm and home for the entire property.
42. The testimony of the expert witnesses as to the difference in value of the plaintiffs’ property after the frequent flights of jet bomber planes was not related to comparative sales but rather to the judgment of the witnesses as to how the value might be reduced by reason of the flight of the planes.
43. It is found that the highest and best use of the highway frontage, 1,526 feet by a depth of 300 feet, is for commercial use and that of the remainder is for agricultural use, the use *440 to which it has always been put. While it is true that there is a low cost housing development of about 100 homes, known as Terra Heights, immediately adjacent on the north, that is the only housing development in the immediate area and that was constructed with 100 percent of the cost of $7,000 per house and lot financed by the Federal Government, for the purpose of providing housing for victims of the flood of 1951. It is clear from the evidence that Terra Heights is the only housing development one mile from the plaintiffs’ land toward Topeka.
44. In July 1956 there was a sale of 40 acres of farm land located about one mile east of Highway 75 and about one-half mile north of the north line of plaintiffs’ land which was not served by city water the purchase price of which was $12,000 or $300 per acre. (Myers to Gutting)
In May 1957 there was a sale of 40 acres to Cress and Woodward, who were real estate developers in Topeka. This was pasture land located two miles east of Highway 75 and about one mile north of the plaintiffs’ land. The purchase price was $10,500 or $262.50 per acre.
In July 1955 there was a sale from Linton to Clatterbuck of 557 feet frontage along Highway 75 by 316 feet without improvements, a little less than $30 a front foot. This was located on the west side of Highway 75 across the road from the plaintiffs’ land and one-fourth mile north. The purchase price was $16,000. This property was on grade at the highway but sloped toward the rear where the main line of the Santa Fe Railroad line extended.
In May 1957 a tract of unimproved land fronting along Highway 75 on the east side (the same side as the plaintiffs’ land) for a distance of 554 feet by a depth of 300 feet was sold by Gerlach to Newlin for $20,000 or $36.10 per front foot.
45. The value of the 1,526 feet fronting on Highway 75 for commercial purposes has been impaired by the easement of flight taken by defendant, but this impairment in value is approximately offset by the enhancement in value due to the proximity of the Forbes Air Force Base.
The frontage along Highway 75 comprises approximately 10 acres, leaving 97 acres for agricultural use. While the *441 dwelling house and farm buildings are on the property whose highest and best use is for commercial purposes, their primary utility is in connection with the operation of the farm. The value of this property has been impaired by reason of the fact that the use and enjoyment of plaintiffs’ home has been practically destroyed.
It is found that the value of the entire property, both commercial and agricultural, has been impaired by the amount of $15,000 over and above the enhancement in value by reason of the proximity of the Forbes Air Force Base.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover. It is, therefore, adjudged and ordered that plaintiffs recover of and from the United States the amount of fifteen thousand dollars ($15,000), plus an amount computed thereon at the rate of four (4) percent per annum from September 1, 1955, to the time of payment, all as just compensation for the taking.
It is further concluded that the defendant is vested with a perpetual easement of flight for airplanes of any and every character at an elevation of 1,100 feet and higher above mean sea level over the entire property of the plaintiffs.
Plaintiffs will execute a deed in fee simple conveying such easement to defendant.