Reed, Justice (Ret.),
sitting by designation, delivered the •opinion of the court:
Plaintiffs are owners in fee of undivided interests in nine forty-acre contiguous plots in a section of land adjoining the municipal airport of Duluth, Minnesota.
This is an action to recover compensation for the taking of plaintiffs’ property by the United States through its use of the property’s navigable airspace, below minimum altitudes of flight, between June 1952 and June 1956, when the petition was filed.[1] Plaintiffs’ petition sounds both in damages and as for a taking.
The facts are reported in detail in accompanying special findings. Essentially, jet-powered fighter aircraft owned and operated by the United States Air Force from the Duluth Municipal Airport take off and land at low levels over the plaintiffs’ property lying immediately west of the .airport. Their proximity to the plaintiffs’ property is most accentuated in making instrument landings from west to east, in which case they cross the western end of the property at about 320 feet and the eastern end at about 85 feet in their descent to the runway. In other types of landings, and in all takeoffs, the aircraft describe varying patterns, some of which bring them over parts of the plaintiffs’ property below the present minimum flight altitudes. Takeoff patterns, as well as the amount of noise involved, vary according to the design of the aircraft. Later models generally are somewhat less noisy and possess superior rates of climb. But all are exceedingly noisy. With flights made at frequent inter *227 vals the noise produced at low altitudes prevents tbe economic utilization of part of plaintiffs’ land for residential purposes. We have found that only twenty acres in the .southwest corner and twenty acres in the northwest corner •of the total acreage had a residential potential, and that the defendant’s flight activities adversely affected only the former. The highest and best use of the remainder of the total acreage has been found to be as a woodlot.
Evidently the Government is using the airspace as and when it chooses and expects to continue so to use it indefinitely. If damages result, a servitude would be imposed.[2]
Various heights for flight, depending upon population, congestion, and different conditions on the surface, have been fixed by the successive authorized authorities, now the Civil Aeronautics Board.[3] Generally the minimum safe altitudes are fixed at 1,000 feet for congested areas and 500 feet •otherwise. Since 1937, the regulations on altitude have begun with words of this import, “Except when necessary for take-off or landing, no person shall operate an aircraft below the following altitudes.” [4] In United States v. Causby, 328 U.S. 256, the Supreme Court determined that airspace above the prescribed minimum safe altitudes, as then defined, was subject “to a public right of freedom of interstate and foreign air navigation,” p. 260, 49 U.S.C. § 180. See Braniff Airways v. Nebraska Board, 347 U.S. 590, 594. Now our Declaration of Policy in the Act of 1958 reads:
Sec. 103. In the exercise and performance of his powers and duties under this Act the Administrator shall consider the following, among other things, as being in the public interest:
*****
(c) The control of the use of the navigable airspace of the United States and the regulation of both civil and *228 military operations in such airspace in the interest of the safety and efficiency of both; 72 Stat. 740.
And the Public Right of Transit:
Sec. 104. There is hereby recognized and declared to exist in behalf of any citizen of the United States a public right of freedom of transit through the navigable airspace of the United States. 72 Stat. 740.
In the Gausby case, the path of glide was held not to be in the “navigable airspace which Congress placed within the public domain,” pages 263-266. This conclusion was reached, although the then authorized regulation in use had a height exception for take-off and landing. And the Court determined :
We think that the landowner, as an incident to his ownership, has a claim to it and that invasions of it are in the same category as invasions of the surface. P. 265.
Today there is a different statute. Note 1, supra. We do not think, however, that the change in the definition of navigable airspace affects plaintiffs’ causes of action. The Government’s easement over plaintiffs’ property may be perpetual. Although today navigable airspace with its public right of transit, 72 Stat. 740, § 104, includes the glide, its use by the United States or other aeroplane operators at heights below the minimum altitudes of flight except where necessarv for take-off or landing,[5] may require compensation. The reasoning of the Gausby case leads to this conclusion. It was there said:
The superad]acent airspace at this low altitude is so close to the land that continuous invasions of it affect the use of the surface of the land itself. P. 265.
Plaintiffs’ allegation is for a taking by continuous flying “at low levels for the purpose of landing at and taking off from” the airport.
While the usefulness of air transportation admonishes everyone that outmoded concepts of property rights must not limit its development, fairness requires that landowners be compensated reasonably for operations that immediately and directly limit the exploitation of their properties.- Air *229 ports which normally have the power of eminent domain might have extended their ownership of aviation rights for their customers over lands within the glide area. This would ■obviate suits against aeroplane operators but lack of resources •and of knowledge as to possible future aviation developments has limited the use of such arrangements.[6]
It would appear from the Gausby decision that flights •above the 500-foot regulated ceiling are beyond the reach of the landowner’s objection to interference with his property rights. As to such use, he is in the position of abutting ■owners along public highways or railroad rights-of-way.[7] The normal immunity to private actions, “based upon those incidental inconveniences that are unavoidably attendant” upon operations, applies we think to air routes allowable under public authority.
Defendant’s objections and exceptions to the report of the ■commissioner and its request for special and additional findings have all been examined. Nothing, it seems to us, requires any change in the findings as submitted.
We conclude as a matter of law from the facts of this case that the increased burden placed upon this property by defendant’s use of the jet planes in the lower reaches of defendant’s navigable airspace is a taking of a perpetual easement of flight 'by defendant for its planes over the entire property of plaintiffs’ 357.7 acres[8] at elevations above eighty-five feet. See Findings of Fact 11 (c) and (d), and 12. Plaintiffs will execute a deed conveying to defendant such an easement.
The taking took place August 1,1953, when the jets began to fly.[9] Considering all relevant facts, we conclude further :as a matter of law that plaintiffs are entitled to recover of and from the United States five thousand eight hundred *230 dollars ($5,800), as just compensation for the taking, with interest from August 1, 1953, at four percent per annum to the time of payment, subject to the execution of the deed referred to in the preceding paragraph.
It is so ordered.
Laramoee, Judge; Madden, Judge; WhitakbR, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The Court, having considered the evidence, the report of Trial Commissioner C. Murray Bernhardt, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiffs are owners of nine contiguous 40-acre tracts of unimproved land comprising 360 acres[10] in section 3, Herman Township, County of St. Louis, State of Minnesota, on the outskirts of Duluth. Since each “section” of land is symmetrically divided into 16 forty-acre tracts, the arrangement of the nine forties in question in section 3, which has some bearing on what follows, can be determined by their locational designations which are:
NW%NW%, NE%NW%, SE1/4NW1/4, NW!4SWi45 NE%SW%, NWMNE1/4, SW14NE14, NW%SE%, NE14SE14.
The reader should, before proceeding further, plot the above forties visually for purposes of orientation.
The NEI/4SE14 was acquired by plaintiffs 1 and 3 in 1949 at a delinquent tax sale for $83, and the NW%NW}i was acquired by plaintiffs 3 and 4 in 1950 by private purchase for $600, one-half interest in the latter tract being later conveyed to plaintiffs 1 and 2. The remaining seven forties, along with two other forties in another section and a right-of-way across still other land, were acquired by plaintiffs 1 and 3 in 1946 from a private seller for $1,200, including $400 paid to the seller and $800 in tax arrears on the property assumed by the purchasers. They expended-an undisclosed further sum in a court proceeding to perfect their title so *231 that it would become marketable. Plaintiffs acquired the-property for purposes of subdivision development.
2. The Duluth Municipal Airport, known also as the Williamson-Johnson Municipal Airport, was established sometime prior to 1928. The original airport consisted of two runways of approximately 2,500 feet each in the shape of an L. One of these runways ran in a roughly east to west direction, and is referred to hereafter as the east-west runway. In 1940 the runways were increased to 4,000 feet. In-1947 they were extended to 5,700 feet and an additional runway was constructed which cut at an angle across the two' existing runways in a northwesterly-southeasterly direction.
3. On March 1, 1951, the city of Duluth entered into a lease with the State of Minnesota allowing joint use of the-airport by the Minnesota Air National Guard for an annual rent. The term of the lease ran from March 1,1951, to June-30, 1952, with a provision for extension from year to year by-mutual consent.
4. On June 24, 1951, the city of Duluth entered into a lease with the defendant giving the latter concurrent use of the runways and landing facilities and exclusive use of certain airport areas for the construction of buildings. The-original lease period of March 1,1951, to June 30,1951, which was subject to automatic annual renewal to June 30, 1965,. was, on March 1, 1954, extended to June 30,1979. The lease was subject to termination on 30 days’ written notice by the defendant and obligated the defendant, inter alia, to bear the entire expense of maintaining and repairing the east-west’ runway except for snow and sand removal. During the continuance of this lease the rent was waived under the other-lease to the Minnesota Air National Guard described in finding 3.
5. The westerly projected center line of the east-west runway at the airport described in finding 2 crossed at a 2.5°' angle, inclined north of west, the upper half of the four 40-acre tracts of plaintiffs’ property constituting the bottom tier of the three tiers in which the nine 40-acre tracts were-arranged. From April 1951 to March 1953 the defendant-constructed at its expense a 3,300-foot extension to the west-end of the east-west runway in order to accommodate operations by jet-powered fighter aircraft, making the runway *232 8,000 feet in length exclusive of 1,000-foot overrun areas on ■each end. To do this the defendant acquired, in October 1951, ■a forty-acre tract of land lying due east of and facing across the road from the NEd^SE^ of plaintiffs’ property in suit. At the time they acquired the NE^SE^ the plaintiffs knew that the western boundary of the airport lay 2,640 feet due east of their property and that the latter was in line with the ■east-west runway. The last 1,000 feet of the western extension of the east-west runway is an unpaved but partially gravel-surfaced stabilized end zone which lies entirely within the forty-acre tract acquired by the defendant. The stabilized end zone was designed primarily for purposes of night landings but is also useful as an emergency overrun area. Its western extremity lies 250 feet from the eastern boundary ■of the NE14SE14 of plaintiffs’ property. Since August 1956 the east-west runway has been, with rare exception, the only runway used by defendant’s jet-powered aircraft. It is sometimes used by commercial aircraft of conventional type, but such flights cause no concern to the plaintiffs.
6. Under the leases referred to in findings 3 and 4 the Minnesota Air National Guard has used the airport and the ■east-west runway thereof from March 1,1951, to date. Until November 30, 1952, the Air National Guard was on active ■duty and under the control of the Department of the Air Force. On that date it was inactivated from Federal control •and reverted to state control, and so remains, although its rent for use of the airport is defrayed by defendant. On February 16, 1953, the 515th Air Defense Group of the United States Air Force, later designated the 343d Fighter group, was activated at the airport and was still there at the time of trial.
7. F-86D Sabrejets were put into operation at the airport 'by the defendant in August 1953. In March 1955 they were replaced by F-89D Scorpion jets. In August 1956 the Scorpions were entirely replaced by F-102A jets. Since August 1956 the defendant has operated at the airport an undisclosed number of F-102A jet aircraft, two T-33 jet trainers, a C-47 transport plane, an L-20, and a helicopter. The F-102A’s and the T-33’s are single-engine jet fighter planes, the latter having been converted to training use. The airport is also used by itinerant aircraft of the defendant, by *233 transport planes of the commercial airlines operating in the-Duluth area, and by private planes.
8. Prior to the completion of the east-west runway extension in March 1953 a cattle barn and work farm were located between the eastern boundary of plaintiffs’ property and the western end of what was then the east-west runway. These factors not only made the airport less visible from the-plaintiffs’ property but also tended to minimize the frequency of low-altitude flights over plaintiffs’ property from and to the east-west runway. It is concluded that the degree of flight interference over plaintiff’s property prior to August 1953 would have had little if any detrimental effect on the development of the property for homesite purposes.
9. a. The plaintiff’s contention in this proceeding is that jet fighter aircraft fly objectionably low over their property as they take off from the east-west runway in a westerly direction and as they land on the east-west runway in an easterly direction. The precise number or frequency of such flights over plaintiffs’ property has not been recorded, and the figures reported here are estimates based upon (a) the-known number of hours logged by the defendant’s aircraft during relatively short and non-representative periods of' time, (b) the evidence that each flight averages two hours in duration and involves a takeoff as well as a landing, (c) the confinement of all jet aircraft to use of the east-west runway, and (d) prevalence of wind from the west (i. e., wind rose) 60 percent of the time. As to this last, since it is the habit of aircraft to land as well as well as to take off into the wind to gain certain aerodynamic advantages, it is probable that 60 percent of all jet aircraft leaving the airport take off from the east-west runway in a westerly direction towards plaintiffs’ property and, conversely, 40 percent of all jet aircraft arriving at the airport land on the east-west runway in an easterly direction.
b. From August 1953, when jet aircraft first commenced' operations from the extended east-west runway, to the time of trial, it is estimated that the monthly average throughout, the year of takeoffs by defendant’s jet aircraft in a westerly direction from the east-west runway was 250, comprising 175-by aircraft assigned to the base (F-86D, F-89D, T-33, and,. *234 .since August 1956, F-102), and 75 by itinerant jet aircraft visiting from other bases (F-89, F-86, F-94, and T-33). During the same period it is estimated that the monthly average throughout the year of landings by defendant’s jet aircraft in an easterly direction on the east-west runway was 170, including 120 by aircraft assigned to the base and 50 by itinerant jet aircraft.[11] The number of flights by home-based jet planes may increase in the future during the seasons of moderate weather conditions to perhaps 400 per month.[12] Flight activity is heavier in the warm than in the cold months. The reported number of flights are not spaced -evenly through each day of each month, but fluctuate according to weather and mission requirements. Weekend flight activity by defendant’s aircraft based at the airport is slack compared to weekday activity.[13]
10. a. In taking off from the east-west runway in a westerly direction the defendant’s jet aircraft enter the airspace above plaintiffs’ property at different levels and over different .areas, depending on the operational characteristics of the particular aircraft, its mission or destination, and the pilot’s technique. Deviations from the altitudes and areas hereafter reported in this finding are not uncommon.
b. F-102. This was (at time of trial) the latest operational type of fighter aircraft and has exceptional performance ■qualities. In taking off it becomes airborne before reaching the middle of the runway, and then climbs at a high angle ;and rate of speed. In 95 percent of its westerly departures it executes a right or, sometimes, a left turn at an elevation •of 800 to 1,000 feet above the ground prior to reaching the end of the runway, and on such a mission frequently enters the airspace above the NW%NE^4 of plaintiffs’ property. *235 But on the less numerous occasions when its destination is to the west it will proceed directly over the southernmost tier of four of the plaintiffs’ nine forties, gaining altitude rapidly as it proceeds. On these westward missions, which constitute only 5 percent of the east to west departures from the runway, the planes will enter the airspace over plaintiffs’ property at an altitude in excess of 1,000 feet and will leave the western boundary of plaintiffs’ property at considerably higher altitudes.
c. FS9, F-9Jp. These jet fighter aircraft antedate the F-102 and have somewhat reduced performance capabilities, with the F-94 being superior to the F-89 in general respects, including its rate of climb on takeoff. On east to west takeoffs from the east-west runway they travel to about the center of plaintiffs’ property at altitudes of about 500 feet or greater above the ground in the course of turning off to the right or left. In taking off to a western destination, which occurs in a fraction of their total missions, these aircraft cross the lowest tier of four of the plaintiffs’ nine forties at elevations considerably lower than the F-102. The takeoff courses of the F-84 and the T-33 are not specified in the record, but it is reasonable to conclude that, since they have been superseded by the newer types which have been mentioned, they are more apt in east to west takeoffs to traverse the airspace above plaintiffs’ property in greater depth and at lower altitudes.
11. a. Approximately one-half of landings made by defendant’s jet aircraft from west to east on the east-west runway are visual; that is, under conditions of good visibility, the pilot depends on his own judgment based upon what he sees on the ground, aided by the instruments in his cockpit. The other half, made under conditions of poor visibility, are instrument landings, using either the Instrument Landing Approach System (ilas) or Ground Control Approach (gca) . Due to the human factor, deviations from the elevations and areas reported hereinafter as to visual and instrument landings are not uncommon.
b. Visual landings. Air Force regulations prescribe the visual landing approach procedures for the defendant’s aircraft involved here. In general, the aircraft flies a counter *236 clockwise circle at an altitude of 1,500 feet above plaintiffs’ property, crossing the first third of the approach end of the runway, then twists into a steep turning glide to a point 300 feet above ground level and one-quarter mile distant from the approach end of the runway, then straightens out and glides in to the touchdown point on the runway. In landings to the east on the east-west runway the visual approach and landing procedure brings the aircraft for a brief period approximately 300 feet above the NE14SE14 of plaintiffs’ property.
c. ILAS. In landings on the east-west runway from the west under conditions of poor visability, or in flight proficiency tests, defendant’s jet aircraft based at Duluth are guided in either by ilas or gca. The former is a system involving the communication of instructions to the pilot from radio transmitters on the runway and signals from two fixed stations 3,600 feet and 6 miles west from the approach end of and in line with the runway. This type of landing requires the aircraft to line up with the runway 10 miles away at 1,000 feet above the ground, intercept the prescribed glide path at a point 6 miles from the end of the runway, then follow the gradual descent of this glide path to the point of touchdown on the runway. The ilas glide path crosses the western and eastern boundaries of plaintiffs’ property at elevations of 320 feet and 85 feet, respectively, above the terrain. Itinerant jet aircraft making landings to the east on the east-west runway under conditions of poor visibility use the gca system but not the ilas.
d. GCA. The gca system involves the use of advice from radar equipment on the runway communicated to the pilot. Defendant’s jet aircraft in landing on the east-west runway from the west follow procedures described above for ilas landings and cross the western and eastern boundaries of plaintiffs’ property at 320 feet and 85 feet, respectively, above the terrain.[14]
*237 12. a. The power plants of jet aircraft are noisy. The noise is greater than, and not comparable to, that produced by conventional propeller-driven aircraft. The quality and volume of the noise varies with the power and type of the plane. Curiously, the F-102, probably because of its superior design, is more quiet in operation than the F-94 and F-89, despite its greater power output. In general the sound produced can be likened to the vastly magnified sound of a blowtorch. Certain models, such as the F-89, but not the F-102, produce in passage a whining sound in addition to the conventional blowtorch sound. Jet fighters are equipped with devices known as “afterburners” which provide an auxiliary source of temporary power to give the aircraft greater thrust or power when required. Each of the aircraft involved in this proceeding is so equipped and each utilizes it in taking off, since an aircraft takes off under maximum power until shortly after the plane is airborne, whereupon the afterburner is disengaged.' The engagement of the afterburner considerably augments the noise as well as the power produced by the engine, and creates a percussive effect which vibrates houses and rattles windows, dishes, etc. in the vicinity. A jet fighter produces much greater noise in taking off than in landing, for in taking off it is operated under full power, including the afterburner, while in landing the afterburner is not engaged and the engine speed is reduced to 85 percent of maximum revolutions, equivalent to about 50 percent of available power, not including the added thrust of the afterburner.
b. The evidence of the effect of the noise on people in the vicinity of the airport is, for the most part, subjective, depending on their varying susceptibilities. In general, the noise of jet aircraft in taking off, and less so in landing, interferes with conversations below, particularly outdoors. Audibility of ■ telephone conversations is impaired. ' Television images “shimmy.” Sleep is interrupted. Horses working in the woods shy violently upon the sudden overhead appearance of the low-flying planes. Aircraft mechanics wear earplugs while working within 50 to 100 feet of the planes. The noise decreases with distance, but if the wind is in a certain direction the noise of a jet aircraft is *238 uncomfortably loud from the time it warms up and turns on its afterburner until it completes its takeoff and has passed on. Witnesses living two miles west of and in line with the east-west runway, as well as those living one-half mile south of the west end of the runway, testified collectively to the foregoing observations and experiences. However, a trailer court one-half mile south of the west end of the runway remained well-occupied, despite the apparent ability of the trailers to move beyond the reach of the airport noises. At times when a jet aircraft exceeds in flight the speed of sound it produces a noise similar to a peal of thunder which vibrates houses below. To some the suddenness of the appearance of low-flying jets, because of their great speed and unusual sound, is unnerving. No evidence was offered as to technological efforts to muffle at source the noise produced by jet aircraft. In addition to the noise, there is a danger of aircraft crashing within the vicinity of the airport, although the record reflects but one crashlanding on the nearby highway during tire period concerned.
c. It may be concluded that, assuming the plaintiffs’ presently unimproved and uninhabited nine forties to be otherwise suitable for homesite development, the activity of the defendant’s jet aircraft would in itself impair and render unsuitable for such development more than 50 percent of the total area, and that the areas remaining suitable for such development would be those furthest removed from the landing and takeoff patterns herein described. Principally that part of plaintiffs’ property lying within the western approach zone to the east-west runway would be adversely affected, plus the NW-^NE^ and the northernmost two-thirds of the S W -^NEi^..
13. The western approach zone to the east-west runway (alternatively known as the west flight zone) is a symmetrical, funnel-shaped area (forming an isosceles trapezoid) flaring out westward from the western end of the west overrun area, with the projected center line of the runway as its axis. It embraces 50 percent of the plaintiffs’ total acreage in suit, not touching any part of the top tier of three forties. Its boundaries were formally defined in amended regulations promulgated by the Duluth Airport Joint Zoning Board on *239 August 18,1954, which, established a 50 to 1 flight clearance elevation within the approach zone above which plane no structures or things are allowed to remain that would interfere with flights,[15] and which limited the height of structures to 75 feet in about 65 acres of plaintiffs’ property lying outside the approach zone.
VALUATION
14. Location. Plaintiffs’ property is in Herman Township, about 8 miles — 10 to 15 minutes by car — from downtown Duluth. It is 1,320 feet north of the Miller Trunk Highway, a main arterial highway connecting Duluth with the Mesabi Range. Churches, schools, stores and recreational facilities are within a convenient radius. The Township has an adequate network of roads. Most of the residential development in the Township, both as to subdivisions and individual homes, has occurred along the Miller Trunk Highway and along hard-surfaced roads south of it. A great majority of the area north and west of plaintiffs’ property is open and unimproved, much of it being swampy, except for small farms and a few small subdivisions. The land north of the Miller Trunk Highway between plaintiffs’ property and the immediate environs of Duluth is sparsely settled.
15. Topography.
a. Plaintiffs’ property is vacant, unimproved, and substantially covered with a second growth of small trees of varied species up to 40 feet in height suitable for pulpwood, firewood, and fence posts. It averages 1,500 feet above sea level, is rolling in contour with a high ridge through its center sloping down to low, moisture-retaining areas on either side. An extensive muskeg or peat bog covers most of the NE^SfN/i: extending well into the NW^SE^ and the SWI4NE14. Low, wet areas occur in the NW^SYAi and at numerous places scattered throughout the nine forties. The higher areas appear to be rockstrewn, although soundings *240 have not been made to determine subsurface conditions. It is likely that difficulty would be encountered in digging wells and aseptic tanks, due to the prevalence of boulders and indicative subsurface conditions. Natural drainage is poor in the low areas due in part to an abundance of springs and .a high ground water table, and neither the feasibility nor approximate cost of correcting the drainage for purposes of a residential development have been adequately explained in the record. It is questionable if more than half of the total area would lend itself physically to homesites, because of the hogs and rock formations, but the vegetation and general contour of the land itself, aside from its stated imperfections and the state of the market, would be potentially attractive for a planned residential community. The defendant acquired 2.3 acres in the NW^SE^ in 1953 from the plaintiffs and built thereon a marker station along the projected center line of the east-west runway for use in conjunction with the instrument landing system described in finding 11c. A government-owned road was constructed from the Miller Trunk Highway to the market station and would constitute an additional degree of interference with the proper development ■of a planned residential community in that forty.
b. Two of the three forties constituting the western perimeter of plaintiffs’ property abut on the east side of Ugstad Road, a gravel-surfaced road, the third forty having no •direct means of egress or ingress by suitable road. One of the three forties constituting its eastern perimeter fronts on the west side of the hard-surfaced Lavaque Road, while the other two have no direct means of egress or ingress by suitable road. The three forties constituting its northern perimeter front on Seville Road, which in that stretch is no longer passable due to abandonment and disuse, so in effect the three northern forties have no suitable present means of ingress or egress to the north without extensive road renewal. The four forties constituting its southern perimeter adjoin throughout their length four forties separating them from the Miller Trunk Highway by 1,320 feet, and thus have no direct means of ingress or egress to the south. In summary, only one side ■of each of three of the nine forties fronts on existing suitable roads, the balance of the forties being landlocked. So-called tote roads have been bulldozed through at various points, *241 mostly since 1953, to provide access for timber-cutting. Of course, were the tract to be developed for residential purposes, roads could be cut through for suitable access to existing main thoroughfares, at a cost.
16. Demand* Census figures relating to the Duluth-Superior area reflect that, in the twenty year period from 1930 to 1950, the population growth shifted to suburban areas and that Herman Township experienced a larger rate of growth percentagewise than did the cities or any of the other neighboring townships. Thus, while Duluth underwent a population growth of 3 percent from 101,463 to 104,-511, Herman Township had a growth of 160 percent from 1,212 to 3,159. Since 1950 about 35 or 40 new homes have been constructed each year in the Township. Plaintiffs own or have interests in three small real estate developments located on or near the Miller Trunk Highway just beyond the property in suit, known as the Miller Trunk Homesites, Northline Acres and Eangeway Acres. Two of the 11 lots comprising Miller Trunk Homesites have been sold, and all of the 7 lots in Eangeway Acres and the 12 or 13 lots in Northline Acres have been sold. All 19 lots in a 26 acre development known as Getchell Eoad Acres, a more desirably located subdivision than plaintiffs’, have been sold. Most if not all of these sales have been made since 1946. The largest privately owned real estate development in Herman Township has been Gethsemane Acres, a forty-acre tract of which 20 acres were platted in 1953 and two out of 20 lots sold since. Plaintiffs’ property has been platted as a residential community but the plats have not been filed with the county authorities because to do so would tend to increase the tax rates. If plaintiffs were to have commenced a development program they would have developed one forty-acre tract at a time, or a part thereof, for economic reasons and because the anticipated demand for lots was not such as to justify a sales and development program covering the entire nine forties simultaneously. There was a good market for homesites in 1953 in Herman Township, but a number of tracts of land smaller than plaintiffs’ and with superior locations nearer to Duluth were and are available without development having been undertaken. In summary, even with the airport absent and assuming suitable qualifications *242 otherwise, it may be concluded that, although Herman Township has been receiving more than its proportionate share of the population shift in the Duluth area, the numerical increase in the Township was not such in 1953 as to justify belief that plaintiffs’ entire tract could be successfully developed and absorbed as a planned residential community within the reasonable future, even in forty-acre installments. It is not likely that the real estate activity throughout the Township would have justified the sale for development purposes of more than 20 best-situated acres of the plaintiffs’ entire tract in 1953, nor that a purchaser could have been found for the entire tract except under an arrangement where the purchaser would commit himself to the whole tract on a piecemeal basis as each lot was developed and sold.
17. Comparable sales.
a. In 1956 and 1957 two 40- and 60-acre tracts of unimproved land situated four or five miles closer to Duluth than plaintiffs’ property, some of it with more suitable topography and road locations, sold for $42 to $50 per acre. Acre size lots in Miller Trunk Homesites, Northline Acres and Eangeway Acres, all platted subdivisions in which plaintiffs were interested and all situated on or just off the Miller Trunk Highway beyond the property in suit, sold at prices of $350 to $600 per lot in the late 1940’s and early 1950’s. These sales were the only sales of a remotely comparable nature provided by the record. Other sales of allegedly comparable property were referred to in testimony, but essential information as to dates, amounts, locations and topography was not adequate for purposes of comparison.
b. In February 1952 the plaintiffs sold one Anderson, a housing developer, a 90-day option to purchase eight of the nine forties in suit (excluding only the NE^SEj^,) for $100 per acre. The option was not exercised because Anderson could receive no assurances that the airport expansion plans would not adversely affect the marketability of lots and houses in a development so located. Anderson’s inspection of the property prior to purchasing the option was most cursory and inadequate and, since the option consideration was nominal, it is questionable whether he would have acquired the entire eight forties outright at the option price even if the airport-expansion danger was not present. More *243 likely he would have contracted to purchase the better locations in the property on a lot-by-lot basis as each lot was developed and sold.
18. Highest and best use. Advice of experts as to the highest and best use of plaintiffs’ property in 1953, assuming the absence of defendant’s aircraft activity, ranged from large-scale residential development in partial stages to use as a “woodlot” for growing trees for firewood, pulpwood and fence posts. One reported a nominal speculative value of the property for possible acquisition by the state or Federal authorities should the airport be further expanded westward. Considering the availability of superior land more advantageously located, the housing demand in Herman Township, the pattern of successful developments in Herman Township clustering around the Miller Trunk Highway or along main roads south of that compared to the small amount of frontage of plaintiffs’ potential homesites on existing roads, and the topography and physical characteristics of plaintiffs’ property, it is reasonably concluded that, in the absence of defendant’s aircraft activity, the highest and best use of the west halves of the NW1/4SW’1/4 and the NW^NW1/! in 1953 was residential, while the highest and best use of the balance of the property was as a woodlot. The position of the NW^SYf1^ in the west approach zone to the east-west runway effectively prevented the plaintiffs from using the west half of that forty for its highest and best use as a residential property and restricted them to using it as a woodlot. However, the highest and best use for residential purposes of the west half of the NW^NW^, lying well beyond the west approach zone to the east-west runway, has not been detrimentally affected and so remains as suitable for homesites as it would have been without the existence of flights by defendant’s aircraft. The remaining seven of the plaintiffs’ nine forties, plus the east halves of the NW^NW^ and the NW%SW%, have not had their highest and best use as wood lots impaired by defendant’s activities. This appraisement is subject to future modification should the facts of airport development or of growth in the Duluth area exceed those reasonably to be contemplated in 1953 so as to foster a heavy demand for homesites in the neighborhood of plaintiffs’ property. Frequently the con *244 stituent parts of a fully assembled large tract of land suitable for residential development acquire increased value per unit over their individual values before being assembled, but this does not apply where, as in the case of plaintiffs’ property, the reasonably anticipated demand for homesites in the area cannot absorb the size of the site available for development, and where the suitability of the land itself for homesites is interrupted in substantial areas by physical blemishes not conducive to such development.
19. Market value.
a. Evidence from expert witnesses as to fair market value of plaintiffs’ property, with and without aircraft activity, varied widely and reflected in some instances more bias than objectivity. Such testimony based on inadequate study and preparation was heavily discounted. Thus, assuming no aircraft activity, the values given for plaintiffs’ entire property by plaintiffs’ expert witnesses, as of 1952, were $135,000, $180,000, and $204,000, and the same given by defendant’s expert witnesses as of July 1953 were $4,400 and $14,000. The values given for the property as of 1956 on the assumption of aircraft activity ranged from zero to $9,000 by plaintiffs’ experts, and from $4,400 to $14,000 by defendant’s experts. The defendant’s latter estimates conceded no detrimental effect to the highest and best use of the property by aircraft activity, and thus no change in value.
b. Based on all the evidence, it is found that the fair market value as of July 1953 of the plaintiffs’ 357.7 acres of property, without the interference of defendant’s aircraft activity, was $19,800, that the actual market value as of that date because of the defendant’s aircraft activity, was $14,000, and that the $5,800 diminution in the value of plaintiffs’ property for its highest and best use was confined to the 20 acres constituting the west half of the NW^SW^,7 whose potential for residential development was effectively frustrated.
CONCLUSION OE LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover, and it is therefore adjudged and ordered that plaintiffs recover of and from *245 the United States the sum of five thousand eight hundred dollars ($5,800), together with interest thereon from August 1, 1953, to date of payment at the rate of four percent per annum as part of just compensation, subject to the execution of the deed referred to in the opinion. ' •

 “Navigable airspace” was then defined as follows:
“ ‘Navigable airspace’ means air space above the minimum altitudes of flight prescribed by regulations issued under this chapter.” 49 U.S.C. § 401(24).
It is now defined by the Federal Aviation Act of 1958 as follows :
“ ‘Navigable airspace’ means airspace above the minimum altitudes of flight prescribed by regulations issued under this Act, and shall include airspace needed to insure safety in take-off and landing of aircraft.” 72 Stat. 739.
S. Rep. No. 1811, 85th Cong., 2d Sess.; H.R. Reps. Nos. 2360 and 2558, 85th Cong., 2d Sess.

 Portsmouth Co. v. United States, 260 U.S. 327; United States v. Causby, 328 U.S. 256, 262, 104 C. Cls. 342, 109 C. Cls. 768. On remand oí the Gausby case for determination of the character of the easement, the Court of Claims found the easement had been abandoned and entered judgment for damages only, not for the taking. 109 C. Cls. 768.

 72 Stat. 741, See. 201.

 14 CER (Civil Aviation) § 60.17; 2 Red. Reg., Part 2, 2184; 10 Red. Reg. 5066. Cf. William B. Harvey, Landowners’ Rights in the Air Age, 56 Mich. L. Rev., at 1318.

 14 CEE § 60.17.

 See Gen. Stat. of N. Car., 2B, ch. 63, § § 6 and 31; Fixel, Law of Aviation (3d ed.) § 196; Rhyne, Municipal Law 489; Rhyne, Airports and the Courts (1944), ch. VII; Minn. Stat. Anno. (1957) § 360.032. Cf. Civil Aviation Act (1949), 12 and 13 Geo. 6, c. 67, Pt. Ill, § 24.

 See Richards v. Washington Terminal Co., 233 U.S. 546, 555; Cambell v. United States, 266 U.S. 368 ; United States v. Central Eureka Mining Co., 357 U.S. 155.

 2.3 acres had been previously purchased as a site for a marker station. See City of Newark v. Eastern Air Lines, 159 F. Supp. 750, 760; Dick v. United States, 144 C. Cls. 424.

 Highland Park, Inc. v. United States, 142 C. Cls. 269; Herring v. United States, 142 C. Cls. 695.

 Less 2.3 aeres In the center of the section purchased by the defendant in 1953 as a site for a marker station used in conjunction with an instrument landing system referred to in finding lie.

 Tile takeoff and landing statistics relating to Air Force planes contain a •5 percent estimated factor representing so-called “touch-and-go” practice landings and takeoffs, where the aircraft simulates a landing by executing its approach, touching down briefly on the runway, then immediately accelerating and talcing off to go around or up again, meanwhile affecting plaintiffs’ possession in approximately the same degree as in actual landings and takeoffs.

 Which would increase the foregoing figures of takeoffs and landings, respectively, by approximately 77 and 48 per month.

 In addition to the landings and takeoffs by aircraft owned by defendant, the Minnesota Air National Guard operates an undisclosed number of flights by jet aircraft each month, amounting to fewer than those by defendant. The number is unimportant since defendant would not be liable for Air National Guard activities.

 The record contains voluminous data describing the airport clearance criteria ratio of 50 to 1, the 2.5° glide path angle for instrument landings, the 15 to 1 glide path angle for visual landings, and the 4.4 to 1 angle for steep approaches. While all of this is interesting, only those deductions essential to a resolution of this controversy have been utilized.

 This is a plane commencing at the west end of the east-west runway proper and rising westward 1 foot -vertically for each 50 feet horizontally, so that arithmetically it crosses the east boundary of plaintiffs’ property at 25 feet and the west boundary at 130.6 feet. It is not a restriction on minimum heights at which aircraft are permitted to fly, but rather a restriction on the maximum permitted height of obstructions to flight. Aircraft are required- to fly considerably higher than this clearance angle.