**I. Robert WRIGHT and wife, Laura B. Wright**

v.

**UNITED STATES.**

**No. 129–56.**

United States Court of Claims.
June 8, 1960.

**518**

Alvin Y. Bell, Dayton, Tenn., for plaintiffs. Taylor H. Cox, Knoxville, Tenn., was on the briefs.

David D. Hochstein, Washington, D. C., with whom was Asst. Atty. Gen. Perry W. Morton, for defendant.

WHITAKER, Judge.

Plaintiffs are the owners of 4.5 acres of land in Blount County, Tennessee, about 9 miles south of the city of Knoxville, and about a mile north of the northeast end of the runway at the McGhee-Tyson Airport, principally used by military aircraft. They sue for the taking of an avigation easement by the Government under which it asserts the right to fly its planes of whatever character over plaintiffs' property at an altitude of 250 feet and above.

We are of opinion that plaintiffs are entitled to recover.

The airport is owned by the city of Knoxville. It was put into operation as a civilian airport for private and commercial planes sometime prior to 1942. On December 19, 1951, the city of Knoxville leased approximately 850 acres in the northern part of the airport to the United States on a one-year renewable basis until September 1, 1971. As amended, the lease provided for a rental of $28,-593.62 a year until September 1, 1971, and for a rental of $1.00 a year thereafter. In 1953 the United States constructed a runway, running from northeast to southwest, 9,000 feet long, and about 1,400 feet northwest of and parallel to a 5,000-foot runway, which had been constructed by the city of Knoxville prior to the opening of the airport in 1942. This 9,000-foot runway was used for instrument landings for all types of planes and was used almost exclusively by the military planes of the defendant whether the landing was made on instruments or not.

Plaintiffs moved into their property in May 1946, after the airport had been in operation for some four years. On plaintiffs' property there was a six-room brick dwelling, and six-room frame cottage, separated from one another by 300 feet. Plaintiffs' house was a mile from the northeast end of the 9,000-foot runway.

In 1953 the 355th Fighter Group of the United States Air Force was stationed at the McGhee-Tyson Airport, and it remained stationed there until approximately July 1, 1958. The 355th Fighter Group was equipped with F–86D's, which are single-engine, all-weather, radar-equipped, fighter-interceptor, jet aircraft, known as Sabre Jets. In landing and taking off they make a terrific noise, and belch a great volume of fire and smoke from their exhausts. There were an average of 79 take-offs a day toward the northeast end of this runway.

Theoretically, these jets are supposed to be airborne after travelling about 3,500 to 4,000 feet of the runway, and thereafter to climb at the rate of 500 feet per minute, rapidly increasing this to 1,000 feet a minute. When this theoretical pattern was followed, the planes would be from 600 to 1,200 feet above the ground when they passed over plaintiffs' property. The pilots and operation officers attached to this Fighter Group testified that 90 percent of all the planes that took off toward the northeast end of this runway turned away from plaintiffs' property after they were a few hundred feet from the end of the runway and, hence, did not pass directly over plaintiffs' property. The other 10 percent did pass over plaintiffs' property, but they testified that they did so at altitudes ranging from 700 to 1,200 feet.

However, notwithstanding this testimony, the Commissioner has found, and after careful study we have adopted his finding, that a substantial number of the jet aircraft did pass over plaintiffs' property at altitudes of less than 300 feet. In order to give such aircraft an added thrust at take-off, they were equipped with "afterburners", and on occasion these aircraft flew so low over plaintiffs' property that the fire from these afterburners scorched the foliage, thereby inducing the fear in plaintiffs that such aircraft might strike the houses erected on the property.

█ As a result of these flights, the Commissioner has found:

"The noise and vibration caused by the jet aircraft in flying over plaintiffs' property at low altitudes have caused plaintiffs to live in a state of nervousness, fright and apprehension. Plaintiffs' sleep, conversation, entertainment of guests, and other normal activities of daily living have been thereby interrupted and disrupted. The vibrations have caused jagged cracks to appear in the walls and ceilings of the plaintiffs' main house. The disturbance and apprehension caused by such flights have substantially deprived plaintiffs of the normal use and enjoyment of their property as a home."

We have adopted this as the finding of the court.

The mission of the 355th Fighter Group was to protect a number of industrial and governmental installations in and around Knoxville, Tennessee. These installations include the extensive installations of the Aluminum Company of America (Alcoa), the hydro-electric facilities of the Tennessee Valley Authority, such as the Norris Dam and others, the installations of the Atomic Energy Commission at Oak Ridge, and also Fort Knox, Kentucky, and other things. Based on the Commissioner's finding, to which no exceptions were taken, we have found that "considering the industrial

targets under the protection of the 355th Fighter Group at McGhee-Tyson Airport, it seems inevitable that such group or a similar group will be stationed at this airport for an indefinite period of time".

Under the foregoing facts, it must be concluded that the United States took an easement of flight over plaintiffs' property at altitudes of 250 feet and above, and that the taking of this easement has substantially affected plaintiffs' use and enjoyment of their property. See Causby v. United States, 60 F.Supp. 751, 104 Ct.Cl. 342, United States v. Causby, 328 U.S. 256, 66 S.Ct. 1062, 90 L.Ed. 1206; Highland Park, Inc. v. United States, 142 Ct.Cl. 269; Matson v. United States, Ct. Cl., 171 F.Supp. 283.

The situation described above continued from sometime in 1953 until the 8th of January 1958. On that date the 355th Fighter Group was inactivated and the military facilities at this airport were turned over to the Tennessee Air National Guard, which has been federally recognized but which had not been called into the service of the Federal Government during any part of the time with which we are concerned. Upon the inactivation of the 355th Fighter Group at the McGhee-Tyson Airport, the 134th Fighter Group of the Tennessee Air National Guard moved in and took over the airport facilities of the United States Air Force.

On February 13, 1958, the Department of the Air Force directed the Chief of Engineers to obtain a modification of the existing lease between the city of Knoxville and the United States covering the use of the McGhee-Tyson Airport, in order to permit the Tennessee Air National Guard to use it. Accordingly, on April 2, 1958, the lease was amended to provide for such use and to provide for the payment of the stipulated rental by the Tennessee Air National Guard United States Property and Fiscal Officer, instead of by the Finance Officer at Grandview Air Force Base, Missouri. The amendment to the lease recited, in part:

"Whereas, the Department of the Air Force has deactivated the military units stationed at the facility,

and suspended operations on the leased premises; and

"Whereas, the Tennessee Air National Guard contemplates the use of the leased premises, and the assumption of the payment of rentals thereunder; * * *.

\* \* \* \* \* \*

"a. Paragraph 2 is amended, effective 1 April 1958, by adding "and for Tennessee Air National Guard purposes" to the last line of said paragraph, so that said line will read as follows:

" 'Said premises are to be used for military purposes and Tennessee Air National Guard purposes.'

"b. Paragraph 4 of the original lease, as amended, is hereby further amended to provide that effective 1 July 1958, rental payments accruing on and after said date will be made by the United States Property and Fiscal Officer, Vultee Boulevard, Nashville, Tennessee.

"All other terms of the original lease as amended shall remain in full force and effect."

The Tennessee Air National Guard had a complement of 25 F86 Sabre Jets, 2 jet trainers, and 2 propeller-driven cargo aircraft. All of the pilots of the planes and other personnel at the airport were thereafter civilians and members of the Tennessee Air National Guard, although the pilots were also reservists in the United States Air Force, on inactive duty. From the time the 151st Fighter-Interceptor Squadron, which was a part of the 134th Fighter Group, reached its full strength in the summer of 1958, the flights have averaged about 400 a month, each flight including a take-off and a landing, and a substantial number of these flights passed over plaintiffs' property at substantially the same altitudes as when the United States Air Force was using the airport. These flight operations were not under the control of the United States Air Force, but were under the sole and exclusive control and direction of the Tennessee Air National Guard, and were made by pilots attached to the Tennessee Air National Guard, and not by pilots of the United States Air Force, except in a few instances now to be mentioned.

A daily 14-hour alert was maintained at the McGhee-Tyson Airport, after the Tennessee Air National Guard took over, for training purposes. This alert is known as a "scramble". Its purpose is to assure that the assigned pilot will be airborne within 5 minutes, in case of emergency. It is carried on by 5 pilots, each of whom is on duty at various times between 5:30 a. m. and 7:30 p. m. each day. These pilots are selected by rotation from the pilots of the Tennessee Air National Guard, and when they are engaged in this "scramble" they do so as reserve officers of the United States Air Force, having been recalled to active duty in the United States Air Force for this purpose. These flights average about one a day, and all of them pass over plaintiffs' property at varying altitudes.

The Commissioner found: "During the operation of flights by personnel of the Tennessee Air National Guard [both the 'scrambles' and other flights], the disturbance of plaintiffs' enjoyment of their property" has been substantially of the same character as it was when the 355th Fighter Group of the United States Air Force was stationed at the McGhee-Tyson Airport, though to a lesser degree. This finding is unexpected to and has been adopted by the court as one of its findings of fact.

As heretofore stated, the Commissioner found that, considering the industrial targets under protection of air forces at the McGhee-Tyson Airport, it is to be presumed that some element of the United States Air Force, or some allied group, will be stationed at this airport for an indefinite period of time. When the Government asserted the right to fly its jet planes over plaintiffs' property at these low altitudes, it did not do so for a limited time, but for such time as it cared to use it, that is to say, for an indefinite time. When it inactivated the 355th Fighter Group at the McGhee-Tyson Air-

port, it did not abandon the easement, as is shown by the amendment to the lease. This amendment recited: "Whereas, the Department of the Air Force has deactivated the military units stationed at the facility, and *suspended* operations on the leased premises; * * *." The amendment to the lease also recited: "Said premises are to be used for *military purposes* and Tennessee Air National Guard purposes." (Italics supplied.) The easement taken by the United States was not abandoned; it was merely suspended except for the times it was used by pilots called into the service of the Air Force for the scrambles.

Moreover, the proof shows that the United States paid 75 percent of the cost of the maintenance of the 134th Fighter Group of the Tennessee Air National Guard. The United States Government did this in order that it might have in reserve an efficient, well-trained unit of the Tennessee Air National Guard which might be called into Federal service when needed. While the Tennessee Air National Guard was not a part of the armed forces of the United States until it was called into Federal service, nevertheless, it was supported by the military establishment as a reserve which could be called into Federal service at the will of the United States. The training of it was for the benefit of the United States, as well as for the benefit of the State of Tennessee, and hence the United States cannot escape liability for the use of the easement after it itself had discontinued its use of it and had turned it over to the Tennessee Air National Guard, especially since this use was by permission of the United States until such time as the United States itself elected to resume use of it.

By this we do not mean to say that under all circumstances the United States would be liable for the acts of a State National Guard which had not been called into Federal service. We merely say that under the circumstances of this case the United States is liable to pay compensation for the easement it took and which it asserts the right to continue to use, and which in the meantime it has permitted the Tennessee Air National Guard to use.

The Commissioner finds that the value of plaintiffs' property was $30,000, and that it had suffered a depreciation in value of 50 percent by reason of the flights of these jet airplanes over it. No exception is taken to this finding, and we have adopted it as a finding of fact by the court.

It results that the United States is liable for the taking of an easement of flight over plaintiffs' property at altitudes of 250 feet and above in the sum of $15,000. Judgment for this amount will be rendered, with interest at 4 percent per annum from the date of the taking, to compensate plaintiff for the delay in payment. Further proceedings will be held pursuant to Rule 38(c), 28 U.S.C.A. to determine the date of the taking. The United States is vested with an easement of flight over plaintiffs' property at altitudes of 250 feet and above for all types of planes.

It is so ordered.

JONES, Chief Judge, and DURFEE, LARAMORE, and MADDEN, Judges, concur.