Whitaker, Judge,
delivered the opinion of the court:
Plaintiffs are the owners of 4.5 acres of land in Blount County, Tennessee, about 9 miles south of the city of Knoxville, and about a mile north of the northeast end of the runway at the McGhee-Tyson Airport, principally used by military aircraft. They sue for the taking- of an avigation easement by the Government under which it asserts the right to fly its planes of whatever character over plaintiffs’ property at an altitude of 250 feet and above.
We are of opinion that plaintiffs are entitled to recover.
The airport is owned by the city of Knoxville. It was put into operation as a civilian airport for private and commercial planes sometime prior to 1942. On December 19, 1951, the city of Knoxville leased approximately 850 acres in the northern part of the airport to the United States on a one-year renewable basis until September 1, 1971. As amended, the lease provided for a rental of $28,593.62 a year until September 1, 1971, and for a rental of $1.00 a year thereafter. In 1953 the United States constructed a runway, running from northeast to southwest, 9,000 feet long, and about 1,400 feet northwest of and parallel to a 5,000-foot runway, which had been constructed by the city of Knoxville prior to the opening of the airport in 1942. This 9,000-foot *388 runway was used for instrument landings for all types of planes and was used almost exclusively by tbe military planes of tbe defendant whether tbe landing was made on instruments or not.
Plaintiffs moved into their property in May 1946, after tbe airport bad been in operation for some four years. On plaintiffs’ property there was a six-room brick dwelling, and six-room frame cottage, separated from one another by 300 feet. Plaintiffs’ bouse was a mile from tbe northeast end of the 9,000-foot runway.
In 1953 tbe 355th Fighter Group of the United States Air Force was stationed at the McGhee-Tyson Airport, and it remained stationed there until approximately July 1,1958. The 355th Fighter Group was equipped with F-86D’s, which are single-engine, all-weather, radar-equipped, fighter-interceptor, jet aircraft, known as Sabre Jets. In landing and taking off they make a terrific noise, and belch a great volume of fire and smoke from their exhausts. There were an average of 79 take-offs a day toward the northeast end of this runway.
Theoretically, these jets are supposed to be airborne after travelling about 3,500 to 4,000 feet of the runway, and thereafter to climb at the rate of 500 feet per minute, rapidly increasing this to 1,000 feet a minute. When this theoretical pattern was followed, the planes would be from 600 to 1,200 feet above the ground when they passed over plaintiffs’ property. The pilots and operation officers attached to this Fighter Group testified that 90 percent of all the planes that took off toward the northeast end of this runway turned away from plaintiffs’ property after they were a few hundred feet from the end of the runway and, hence, did not pass directly over plaintiffs’ property. The other 10 percent did pass over plaintiffs’ property, but they testified that they did so at altitudes ranging from 700 to 1,200 feet.
However, notwithstanding this testimony, the Commissioner has found, and after careful study we have adopted his finding, that a substantial number of the jet aircraft did pass over plaintiffs’ property at altitudes of less than 300 feet. In order to give such aircraft an added thrust at take-off, they were equipped with “afterburners”, and on *389 occasion these aircraft flew so low over plaintiffs’ property that the fire from these afterburners scorched the foliage, thereby inducing the fear in plaintiffs that such aircraft might strike the houses erected on the property.
As a result of these flights, the Commissioner has found:
The noise and vibration caused by the jet aircraft in flying over plaintiffs’ property at low altitudes have caused plaintiffs to live in a state of nervousness, fright and apprehension. Plaintiffs’ sleep, conversation, entertainment of guests, and other normal activities of daily living have been thereby interrupted and disrupted. The vibrations have caused jagged cracks to appear in the walls and ceilings of the plaintiffs’ main house. The disturbance and apprehension caused by such flights have substantially deprived plaintiffs of the normal use and enjoyment of their property as a home.
We have adopted this as the finding of the court.
The mission of the 355th Fighter Group was to protect a number of industrial and governmental installations in and around Knoxville, Tennessee. These installations include the extensive installations of the Aluminum Company of America (Alcoa), the hydro-electric facilities of the Tennessee Valley Authority, such as the Norris Dam and others, the installations of the Atomic Energy Commission at Oak Ridge, and also Fort Knox, Kentucky, and other things. Based on the Commissioner’s finding, to which no exceptions were taken, we have found that “considering the industrial targets under the protection of the 355th Fighter Group at McGhee-Tyson Airport, it seems inevitable that such group or a similar group will be stationed at this airport for an indefinite period of time”.
Under the foregoing facts, it must be concluded that the United States took an easement of flight over plaintiffs’ property at altitudes of 250 feet and above, and that the taking of this easement has substantially affected plaintiffs’ use and enjoyment of their property. See Causby v. United States, 104 Ct. Cl. 342, United States v. Causby, 328 U.S. 256; Highland Park, Inc. v. United States, 142 Ct. Cl. 269; Matson v. United States, 145 Ct. Cl. 225.
The situation described above continued from sometime in 1953 until the 8th of January 1958. On that date the *390 355th. Fighter Group was inactivated and the military facilities at this airport were turned over to the Tennessee Air National Guard, which has been federally recognized but which had not been called into the service of the Federal Government during any part of the time with which we are concerned. Upon the inactivation of the 355th Fighter Group at the McGhee-Tyson Airport, the 134th Fighter Group of the Tennessee Air National Guard moved in and took over the airport facilities of the United States Air Force.
On February 13, 1958, the Department of the Air Force directed the Chief of Engineers to obtain a modification of the existing lease between the city of Knoxville and the United States covering the use of the McGhee-Tyson Airport, in order to permit the Tennessee Air National Guard to use it. Accordingly, on April 2, 1958, the lease was amended to provide for such use and to provide for the payment of the stipulated rental by the Tennessee Air National Guard United States Property and Fiscal Officer, instead of by the Finance Officer at Grandview Air Force Base, Missouri. The amendment to the lease recited, in part:
Whereas, the Department of the Air Force has deactivated the military units stationed at the facility, and suspended operations on the leased premises; and
Whereas, the Tennessee Air National Guard contemplates the use of the leased premises, and the assumption of the payment of rentals thereunder; * * *.
* * * * *
a. Paragraph 2 is amended, effective 1 April 1958, by adding “and for Temiessee Air National Guard pur-fioses” to the last line of said paragraph, so that said ine will read as follows:
“Said premises are to be used for military purposes and Tennessee Air National Guard purposes.”
b. Paragraph 4 of the original lease, as amended, is hereby further amended to provide that effective 1 July 1958, rental payments accruing on and after said date will be made by the United States Property and Fiscal Officer, Vultee Boulevard, Nashville, Tennessee.
All other terms of the original lease as amended shall remain in full force and effect.
The Tennessee Air National Guard had a complement of 25 F86 Sabre Jets, 2 jet trainers, and 2 propeller-driven cargo *391 aircraft. All of the pilots of the planes and other personnel at the airport were thereafter civilians and members of the Tennessee Air National Guard, although the pilots were'also reservists in the United States Air Force, on inactive duty. From the time the 151st Fighter-Interceptor Squadron, which was a part of the 134th Fighter Group, reached its full strength in the summer of 1958, the flights have averaged about 400 a month, each flight including a take-off and a landing, and a substantial number of these flights passed over plaintiffs’ property at substantially the same altitudes as when the United States Air Force was using the airport. These flight operations were not under the control of the United States Air Force, but were under the sole and exclusive control and direction of the Tennessee Air National Guard, and were made by pilots attached to the Tennessee Air National Guard, and not by pilots of the United States Air Force, except in a few instances now to be mentioned.
A daily 14-hour alert was maintained at the McGhee-Tyson Airport, after the Tennessee Air National Guard took over, for training purposes. This alert is known as a “scramble”. Its purpose is to assure that the assigned pilot will be airborne within 5 minutes, in case of emergency. It is carried on by 5 pilots, each of whom is on duty at various times between 5:30 a.m. and 7:30 p.m. each day. These pilots are selected by rotation from the pilots of the Tennessee Air National Guard, and when they are engaged in this “scramble” they do so as reserve officers of the United States Air Force, having been recalled to active duty in the United States Air Force for this purpose. These flights average about one a day, and all of them pass over plaintiffs’ property at varying altitudes.
The Commissioner found: “During the operation of flights by personnel of the Tennessee Air National Guard [both the ‘scrambles’ and other flights], the disturbance of plaintiffs’ enjoyment of their property” has been substantially of the same character as it was when the 355th Fighter Group of the United States Air Force was stationed at the McGhee-Tyson Airport, though to a lesser degree. This finding is unexcepted to and has been adopted by the court as one of its findings of fact.
*392 As heretofore stated, the Commissioner found that, considering the industrial targets under protection of air forces at the McGhee-Tyson Airport, it is to be presumed that some element of the United States Air Force, or some allied group, will be stationed at this airport for an indefinite period of time. When the Government asserted the right to fly its jet planes over plaintiffs’ property at these low altitudes, it did not do so for a limited time, but for such time as it cared to use it, that is to say, for an indefinite time. When it inactivated the 355th Fighter Group at the McGhee-Tyson Airport, it did not abandon the easement, as is shown by the amendment to the lease. This amendment recited: “Whereas, the Department of the Air Force has deactivated the military units stationed at the facility, and suspended operations on the leased premises; * * The amendment to the lease also recited :“Said premises are to be used for military purposes and Tennessee Air National Guard purposes.” (Italics supplied.) The easement taken by the United States was not abandoned; it was merely suspended except for the times it was used by pilots called into the service of the Air Force for the scrambles.
Moreover, the proof shows that the United States paid †5 percent of the cost of the maintenance of the 134th Fighter Group of the Tennessee Air National Guard. The United States Government did this in order that it might have in reserve an efficient, well-trained unit of the Tennessee Air National Guard which might be called into Federal service when needed. While the Tennessee Air National Guard was not a part of the armed forces of the United States until it was called into Federal service, nevertheless, it was supported by the military establishment as a reserve which could be called into Federal service at the will of the United States. The training of it was for the benefit of the United States, as well as for the benefit of the State of Tennessee, and hence the United States cannot escape liability for the use of the easement after it itself had discontinued its use of it and had turned it over to the Tennessee Air National Guard, especially since this use was by permission of the United States until such time as the United States itself elected to resume use of it.
*393 By this we do not mean to say that under all circumstances the United States would be liable for the acts of a State National Guard which had not been called into Federal service. We merely say that under the circumstances of this case the United States is liable to pay compensation for the easement it took and which it asserts the right to continue to use, and which in the meantime it has permitted the Tennessee Air National Guard to use.
The Commissioner finds that the value of plaintiffs’ property was $30,000, and that it had suffered a depreciation in value of 50 percent by reason of the flights of these jet airplanes over it. No exception is taken to this finding, and we have adopted it as a finding of fact by the court.
It results that the United States is liable for the taking of an easement of flight over plaintiffs’ property at altitudes of 250 feet and above in the sum of $15,000. Judgment for this amount will be rendered, with interest at 4 percent per annum from the date of the taking, to compensate plaintiff for the delay in payment. Further proceedings will be held pursuant to Eule 38(c) to determine the date of the taking. The United States is vested with an easement of flight over plaintiffs’ property at altitudes of 250 feet and above for all types of planes.
It is so ordered.
Dureee, Judge; Laramore, Judge; MaddeN, Judge; and JoNes, Chief Judge, concur.
FINDINGS OE FACT
The court, having considered the evidence, the reports of Trial Commissioner Currell Vance, and the briefs and arguments of counsel, makes findings of fact as follows:
1. The plaintiffs, husband and wife, are the owners of 4.5 acres of improved land in District No. 11 of Blount County, Tennessee, on the east side of State Highway 73, about 9 miles south of the city of Knoxville, and approximately 1 y2 miles northeast of McGhee-Tyson Airport, which is owned and operated by the city.
In May 1946 when the plaintiffs first moved onto the property, the major improvements consisted of a 6-room and *394 bath, brick dwelling having dry plasterboard interior walls, and a 2-car brick garage which had been constructed in 1939, which improvements were located about 165 feet from the highway. The plaintiffs obtained fee title to the property in April 1948 at a purchase price of $21,300. Between 1949 and 1954 the plantiffs made additional improvements to the property at a cost of $11,240. These included a black-top asphalt driveway and parking area, a concrete terrace 12' x 40' at the rear of the plaintiffs’ house, an electric water pump, a small barn, and a 6-room frame cottage located about 300 feet southeast of the main house. The cottage had been occupied by the plaintiffs’ son, their daughter-in-law and three grandchildren from the túne of its construction in 1950.
2. McGhee-Tyson Airport was constructed and placed into operation sometime prior to 1942. It is located approximately 10 miles southwest of the city of Knoxville on the west side of State Highway 73 and is situated in a broad valley which runs generaly from northeast to southwest between the Great Smoky and Cumberland mountain ranges. The prevailing winds at the airport are from the northeast approximately 50 percent of the time and from the southwest the remainder of the time.
Since 1942 the airport has been used extensively by commercial and military aircraft of almost every type. Regular and frequent scheduled flights are maintained and operated at the airport by American, Delta, Capital, and Piedmont Airlines; also by two intra-state airlines. The types of aircraft used in the commercial flights include both twin and 4-engine propeller-driven aircraft, such as Convairs, DC-3’s DC-4’s, DC-6’s, and DC-7’s; also the Viscount, a turbo-prop jet aircraft operated by the Capital Airlines. Civilian aircraft of the Aviation Division of the Tennessee Valley Authority and Atomic Energy Commission also make frequent use of the airport.
Throughout World War II and until 1952 or 1953, the airport was used frequently by large numbers of military aircraft of many types, ranging from single and twin-engine propeller-driven trainers, fighters, and light bombers, such as AT-7’s, AT-9’s, AT-10’s, P-39’s, P-40’s, P-51’s, F-47’s, *395 and B-I7’s, to 4-engine medium and heavy bombers, as well as cargo aircraft, such as Rr-24’s, B-29’s, C-46’s, and C-47’s.
3. Prior to 1953 the main runway at McGhee-Tyson Airport was a northeast-southwest concrete runway 5,000 feet long on the southern portion of the airfield. The plaintiffs’ property is located about a mile northeast of the northeast end of th8 runway and is within the approach zone of all aircraft taking off from or landing upon that end of the runway. The plaintiffs were aware of the existence of the airport and its location with respect to their property when they moved onto the premises in May 1946.
4. On December 19, 1951, the city of Knoxville leased approximately 850 acres of land in the northern part of its airport to the United States for a term of one year beginning August 1, 1951, and ending June 30, 1952, at a rental of $27,000 a year. The lease provided that it was to remain in force and effect from year to year until September 1, 1971, unless terminated earlier in accordance with its provisions. Paragraph 10 of the lease provided that the Government could terminate the lease at any time upon 30 days’ notice in writing. Supplemental agreements amending the basic lease were entered into on December 18, 1952, February 23, 1955, and December 15, 1955, the ultimate effect of which was to extend the term of the original lease from year to year until September 1,1986, at a rental of $28,593.62 a year from January 1, 1956 to September 1, 1971, and at the rate of $1.00 a year thereafter. All other terms of the original lease of December 19, 1951, remain unchanged and in full force and effect, including the right of the United States to terminate the lease, as amended, at any time upon giving 30 days’ notice in writing.
5. In 1953 a new concrete northeast-southwest runway 9,000 feet long was constructed at the airport about 1,400 feet northwest of and parallel to the 5,000-foot runway. The instrument landing system which had been located on the 5,000-foot runway was moved to the new northeast-southwest runway in 1953, and since that time the new runway has been designated as the instrument runway and has been used primarily for military aircraft operations, although it has also been used by commercial and civilian aircraft *396 when weather and operating conditions require instrument approaches and landings. Since 1953 the 5,000-foot northeast-southwest runway has been used almost exclusively by commercial and civilian aircraft.
All air traffic, both military and commercial, to or from the two northeast-southwest runways, including all take-offs and landings, is directed and controlled from the control tower operated by the Civil Aeronautics Administration. In order that aircraft pilots may readily distinguish and identify the two northeast-southwest runways, the 9,000-foot military runway has been designated as Runway 4L-22R, and the 5,000-foot commercial runway as Runway 4R-22L. This signifies that when aircraft are approaching the airport from the southwest the military runway will be to the left and the commercial runway to the right on a 40-degree magnetic bearing. In approaching the airport from the northeast the military runway will be to the right and the commercial runway to the left on a magnetic bearing of 220 degrees.
The plaintiffs’ property is within the approach zones of the military and commercial runways. It is located about 5,500 feet northeast of the northeast end of the military runway and in a direct line with the runway.
6. Since 1953 the 355th Fighter Group (formerly the 516th Air Defense Group) of the United States Air Force has been assigned to and stationed at McGhee-Tyson Airport. Its primary mission is to defend important industrial targets in eastern Tennessee, such as the huge plant of the Alwminrmn Company of America (Alcoa), the hydro-electric facilities of the Tennessee Valley Authority, the installations of the Atomic Energy Commission at Oak Ridge, and Fort Knox, Kentucky, from devastation and destruction by enemy bombers and guided missiles. The 355th Fighter Group is equipped with F-86D’s which are single-engine, all-weather, radar-equipped, fighter-interceptor, jet aircraft, known as Sabre Jets.
Considering the industrial targets under the protection of the 355th Fighter Group at McGhee-Tyson Airport, it seems inevitable that such group or a similar group will be stationed at this airport for an indefinite period of time.
*397 7. All air traffic into and out of McGliee-Tyson Airport, both commercial and military, as well as all aircraft operating within a 50-mile radius from Knoxville, has been directed and controlled since June 1942 from a control tower on the field which is manned 24 hours a day by airways operation specialists of the Civil Aeronautics Administration. Statistics compiled by the Department of Commerce from monthly reports of aircraft activity at airports supervised and controlled by the Civil Aeronautics Administration, which were introduced into evidence, establish that during the period June 1942 through December 1952 there were 1,117,060 takeoffs and landings at McGhee-Tyson Airport, including commercial air carriers, military aircraft, and private civilian aircraft, an average of about 8,800 take-offs and landings a month, or more than 290 a day. The evidence establishes that approximately 50 percent of all take-offs and landings during this period (June 1942 through December 1952) were from or onto the northeast end of the 5,000-foot northeast-southwest runway and it is found that a substantial percentage of these flights were over the property owned by the plaintiffs. This conclusion is borne out by the fact that soon after the plaintiffs established their residence on the property in 1946, personnel of the Civil Aeronautics Administration at McGhee-Tyson Airport, who were in charge of the direction and control of aircraft operations at the airport, began receiving complaints from the plaintiff, Mrs. Wright, that commercial aircraft were flying frequently over the Wright property at low altitudes. The frequency of these complaints by Mrs. Wright concerning low-flying commercial aircraft varied from several a week to once or twice a month from 1946 until 1953 when jet aircraft commenced operating at the airport.
Statistics compiled by the Civil Aeronautics Administration from monthly reports of aircraft activity at the airport indicate that during the 7-year pei'iod, 1946-1953, there was a total of 183,391 take-offs and landings made by commercial aircraft at the airport, 50 percent of which were from or onto the northeast end of the northeast-southwest 5,000-foot runway. This amounts to an average of 1,090 take-offs or land *398 ings a month by commercial aircraft at the northeast end of the runway, or 36 a day between 1946 and 1953.
After the installation of the 9,000-foot runway, 1,400 feet northwest of the original 5,000-foot runway, in 1953, the pattern for aircraft taking off from the northeast end of said runways provided for said aircraft upon leaving the runways to diverge, that is for the aircraft from the 9,000-foot runway to bear left, and those from the 5,000-foot runway to bear right. The effect of this pattern is that commercial aircraft for the most part do not pass over plaintiffs’ property, but pass to the south of it over open fields. Likewise, if the pattern were strictly adhered to, military aircraft from the 9,000-foot runway (except in the case of “snake-out” or “combat-trail” flights hereinafter described), would turn left in time to avoid passing over plaintiffs’ property.
8. On November 5, 1954, the commanding officer of the 355th Fighter Group issued a memorandum entitled “Jet Take-off and Noise Abatement” which provided as follows:
1. In the interest of minimizing unnecessary disturbance of populations living close to the jet traffic pattern at McGhee-Tyson Airport, the following practice as implemented June 1954, is hereby confirmed.
a. Take-off of all jet aircraft, with the exception of scrambled aircraft, will be made from runway 22R unless winds out of the northeast exceed 8 knots or unless use of runway 22R would obviously not be within accepted limits of safety.
Thereafter, on June 29, 1955, the Department of the Air Force issued Air Force Regulation No. 55-34, which stated in part as follows:
OPERATIONS
Reducing Flight Disturbances That Cause Adverse Public Reactions
❖ # $ % %
3. Protection of Civilian Communities. Every Air Force base must strive to maintain the best possible relations with its neighboring civilian communities. Commanders must take every precaution to protect communities near Air Force bases from the annoyances and risks associated with flight operations. They should continually review existing traffic patterns, instrument *399 approaches, weather minima and operating practices. These factors should be evaluated in terms of the base in relation to populated areas and other local situations.
This regulation further provided that traffic patterns “should be established to avoid populated areas as much as possible,” and that “all aircraft, whether proceeding straight out or turning should attain 1,200 feet above the terrain as soon as possible.”
In order to avoid flying over the thickly settled and congested areas of the city of Knoxville and its neighboring suburbs, and to minimize noise and disturbance in those areas, Eunway 22E was designated as the preferential runway for take-offs of jet aircraft and Eunway 4L for landings of the jet aircraft, except where weather or other operating conditions required a different procedure. This means that whenever possible the jet aircraft are required to take off from the southwest end of the military runway and land upon the northeast end of the runway.
Due to the presence of the parallel, commercial runway 1,400 feet to the south, and the heavy air-carrier traffic to and from that runway, all jet aircraft taking off from the military runway are required to turn away from the civilian side of the airfield as soon as possible after they have become airborne, unless they are engaged in certain types of missions requiring them to proceed in a straight line. In all cases the jet aircraft are instructed to climb as rapidly as possible until they have reached an altitude of 1,500 feet.
9. The theoretical planned pattern for F-86 Sabre Jets on take-off is to use approximately 3,500 to 4,000 feet of runway, and thereafter to begin climbing at the rate of 500 feet per minute, rapidly increasing this to 1,000 feet per minute. Under such pattern the aircraft would reach an altitude of 300 to 350 feet by the time they were over the end of the runway, and would be 600 to 1,200 feet above the ground when they were 5,500 feet from the end of the runway. On landing the pattern contemplates that the aircraft will be at 500 feet elevation above the ground at a point 5,500 feet from the end of the runway.
10. Although the southwest end of the military runway has been designated as the preferential runway for take-offs *400 by jet aircraft, wind, conditions and operational missions and assignments have made it necessary for the jet aircraft to take off frequently from the northeast end of the runway.
11. Testimony of pilots and operations officers attached to the 855th Fighter Group at McGhee-Tyson Airport established that there has been an average of 79 take-offs a day by jet aircraft from the northeast end of the military runway, and estimated that until December 1956, or January 1957, approximately 90 percent of the aircraft turned to the northwest and away from the civilian side of the field after they were a few hundred feet from the end of the runway, and that these aircraft did not cross State Highway 73 or pass over the plaintiffs’ property. The remaining 10 percent of the flights, averaging about 8 a day, were in a straight line from the northeast end of the runway and in these operations the jet aircraft passed over or near the plaintiffs’ property at altitudes ranging from 700 to 1,200 feet.
Notwithstanding such testimony it is clear that during such time a substantial number of the jet aircraft did pass over plantiffs’ property at altitudes of less than 300 feet. In order to give such aircraft an added thrust at take-off, they were equipped with “after-burners,” and on occasion aircraft flew over plaintiffs’ property so low that foliage was scorched, and plaintiffs feared that such aircraft might strike improvements erected on the property.
12. In January 1957, the Air Force began to place great emphasis on the necessity for the frequent practice of profile missions by jet aircraft at McGhee-Tyson Airport. These are called “snake-out” or “combat trail” formations which involve groups of 3 jet fighter-interceptors. In this type of mission the second jet takes off 30 seconds after the first, and the third jet follows the second jet 30 seconds later. The purpose of the mission is to intercept and shoot down an “enemy bomber” which has been reported as being in a designated area, and the jet aircraft “snake out” one behind the other in a straight line and climb to a high altitude as rapidly as possible. Although the southwest end of the military runway has continued to be the preferential runway for take-offs of jet aircraft, there has still been an average of 79 take-offs 9- day from the northeast end of the runway since January *401 1957,90 percent of which are profile missions, indicating that approximately 70 jet aircraft a day have been flying over, or in the vicinity of the plaintiffs’ property, at theoretical altitudes of 700 feet, or more, since that time. The pattern for these flights after leaving the northeast end of the 9,000-foot runway passed almost directly over plaintiffs’ property, and frequently aircraft in such flights passed over the property at altitudes of BOO feet or less.
13. The noise and vibration caused by the jet aircraft in flying over plaintiffs’ property at low altitudes have caused plaintiffs to live in a state of nervousness, fright and apprehension. Plaintiffs’ sleep, conversation, entertainment of guests, and other normal activities of daily living have been thereby interrupted and disrupted. The vibrations have caused jagged cracks to appear in the walls and ceilings of the plaintiffs’ main house. The disturbance and apprehension caused by such flights have substantially deprived plaintiffs of the normal use and enjoyment of their property as a home.
14. On October 2, 1957, Headquarters, United States Air Force, advised the Commander, Air Defense Command, by teletype that certain units would be inactivated on or about January 8, 1958. Among them were the 355th Fighter Group and the 354th and 469th Fighter-Interceptor Squadrons and supporting units at McGhee-Tyson Airport. This was confirmed by a letter dated November 7, 1957, from the Secretary of the Air Force to the Commander, Air Defense Command.
Pursuant to the message of October 2, 1957, from Headquarters, United States Air Force, the Commander of the Eastern Air Defense Force (ADC) with headquarters at Stewart Air Force Base, New York, issued an order on October 15,1957, which read in part as follows:
GENERAL ORDERS NUMBER 84
inactivation oe units — 1. Effective 8 January 1958, the following units are inactivated at station indicated and will revert to the control of the Department of the Air Force:

*402
Unit

■A' * *
Station of Inactivation $ ❖
HQ, 355 Fighter Group (air defense)
McGhee-Tyson Airport, Tennessee
355 Air Base Squadron
McGhee-Tyson Airport, Tennessee
355 Materiel Squadron
McGhee-Tyson Airport, Tennessee
355 TJSAF Dispensary-
McGhee-Tyson Airport, Tennessee
354 Fighter Interceptor Squadron
McGhee-Tyson Airport, Tennessee
469 Fighter Interceptor Squadron
McGhee-Tyson Airport, Tennessee
15. Between November 1951 and January 1958 the military facilities at McGhee-Tyson Airport were gradually transferred to and taken over by the Tennessee Air National Guard. During this period civilian personnel of the Tennessee Air National Guard gradually relieved and replaced the Air Force personnel, and assumed their duties. These included pilots, mechanics, clerical help and administrative employees who were hired by the State of Tennessee.
16. The 134th Fighter Group of the Tennessee Air National Guard was activated by the State of Tennessee in the fall of 1957, and had one fighter-interceptor squadron- — the 151st— which was given Federal recognition by the National Guard Bureau on October 22,1957, effective December 15,1957. At the conclusion of the change-over period the National Guard Bureau assigned 9 F86 Sabre Jets to the squadron, together with supporting equipment. These aircraft were surplus to the needs of the Air Force and were obsolete.
The transfer of Air Force activities and equipment to the Tennessee Air National Guard was completed by January 1958, except for numerous small items requiring inventory. Military operations at the airport were sharply curtailed and all of the buildings such as the base operations office, mess hall, barracks, hospital, and other major facilities were taken over by the 134th Fighter Group of the Tennessee Air National Guard. By January 1958 the Air Force personnel, *403 numbering approximately 1,200, had vacated the airbase and were replaced by 151 employees of the Tennessee Air National Guard, including pilots.
17. Immediately following the transfer of defendant’s facilities and aircraft at McGhee-Tyson Airport to the Tennessee Air National Guard, the signs and markings on the buildings, vehicles and aircraft and at the entrance to the base were changed so as to show that the airport was in the possession and under the control of the Tennessee Air National Guard. For example, the sign at the entrance to the base was marked in large black letters “i34th fighter group teNhessee air national guard”, all vehicles were marked “air national guard” and the markings on all aircraft were changed from “United States Air Force” to “tenn air guard” in large black letters on both sides of the fuselage.
18. By memorandum dated February 13,1958, the Department of the Air Force requested the Chief of Engineers to obtain a modification of the existing lease between the City of Knoxville and the United States covering the use of Mc-Ghee-Tyson Airport (previously described in finding 4) in order to permit the use of the airport by the Tennessee Air National Guard and to provide that commercing July 1,1958, the annual rental of $28,593.62 would be paid by the Tennessee Air National Guard United States Property and Fiscal Officer instead of by the Finance Officer at Grandview Air Force Base, Missouri. The memorandum itself stated in part as follows:
»f» «í»
3. It is requested that existing lease (DA 40-058-Eng-817) covering Air Force use of McGhee-Tyson Municipal Airport, Knoxville, Tenn., be modified as follows:
a. To permit use by the Tennessee Air National Guard.
b. As of 1 Jul 1958 the $28,593.62 annual rental be paid by the Tennessee Air National Guard USP&FO Officer instead of the Finance Officer, Grandview AFB. This rental to be paid until 1 Sep 1971 and $1.00 per annum for the period from 2 Sep 1971 through 1 Sep 1986. (The Air Force will continue to pay the annual rental until 30 .Tun 1958).
* * * $ ❖
4. It is also requested that appropriate action be initiated to issue a license to the Tennessee Air National Guard for use of the facilities presently available to the Air Force under Lease DA 40-058-Eng-871 *404 subject to Air National Guard paying $28,593.62 annual rental, commencing on 1 Jul 1968, to the City oí Knoxville, Tennessee.
S. Request actions in the accomplishment of the above be coordinated with the Adjutant General, State of Tennessee.
Thereafter, on April 2, 1958, the lease was amended substantially in accordance with the Air Force’s request, and contained, among others the following recitals and provisions:
wheeeas, the Department of the Air Force has deactivated the military units stationed at the facility, and suspended operations on the leased premises; and
whereas, the Tennessee Air National Guard contemplates the use of the leased premises, and the assumption of the payment of rentals thereunder; * * *.
❖ ❖ # #
a. Paragraph 2 is amended, effective 1 April 1958, by adding “and for Tennessee Air National Guard purposes” to the last line of said paragraph, so that said line will read as follows:
“Said premises are to be used for military purposes and Tennessee Air National Guard purposes.”
b. Paragraph 4 of the original lease, as amended, is hereby further amended to provide that effective 1 July 1958, rental payments accruing on and after said date will be made by the United States Property and Fiscal Officer, Vultee Boulevard, Nashville, Tennessee.
All other terms of the original lease as amended shall remain in full force and effect.
19. After tbe inactivation of the 355th Fighter Group of the United States Air Force and its two fighter-interceptor squadrons, and the transfer of defendant’s facilities and equipment at McGhee-Tyson Airport to the Tennessee Air National Guard in January 1958, the 151st Fighter-Interceptor Squadron of the Tennessee Air National Guard had a complement of 9 F86 Sabre Jets which gradually increased during the next 6 months to a full squadron of 25 F86 Sabre Jets, 2 jet trainers (T33’s) and 2 propeller-driven cargo aircraft (C45’s), which were assigned to the squadron by the National Guard Bureau.
From the summer of 1958, when the 151st Fighter-Interceptor Squadron of the Tennessee Air National Guard reached its full strength, to the time of the supplemental hearings in this case (May 29, 1959), the total number of persons employed on the military side of the airport, formerly *405 used and occupied by the Air Force, was 151, of whom 31 were pilots. All of the personnel were civilians and members of the Tennessee Air National Guard, although the pilots were also reservists in the United States Air Force, on inactive duty.
20. The flight activities of the Tennessee Air National Guard at McGhee-Tyson Airport gradually increased from 100 flights a month, when the 151st Fighter-Interceptor Squadron had only 9 jet aircraft, to 400 a month in the summer of 1958 when the squadron reached its full complement of 25 F86 Sabre Jets, and since that time the number of flights has averaged 400 a month, each flight including a take-off and landing. The flight operations were not under the control of the Department of the Air Force, but were under the sole and exclusive control and direction of the Tennessee Air National Guard and were made by pilots attached to the Tennessee Air National Guard and not by pilots of the United States Air Force.
21. In addition to the flight activities referred to in the previous finding, a daily 14-hour alert was maintained at McGhee-Tyson Airport for training purposes. This alert is known as a “scramble”, its function being to assure that the pilot assigned will be airborne within 5 minutes in an emergency. It is carried on by 5 pilots, each of whom is on duty at various times between 5:30 a.m. and 7:30 p.m. each day. Two pilots are on duty between 5:30 a.m. and 12:30 p.m., 2 others are on duty from 12:30 p.m. to 7:30 p.m., and the fifth pilot is usually on duty from 2:00 p.m. to 4:30 p.m.
The 5 pilots participating in the daily 14-hour alert are ordered to active duty in the United States Air Force from the 31 pilots of the Tennessee Air National Guard at the airport on a rotation basis for periods of 1 to 5 days each month. The type of orders issued to such pilots may best be illustrated by excerpts from defendant’s exhibit 33:
headquarters
FOURTEENTH AIR EOROE (COÑAC)
United States Air Force
Robins Air Force Base, Georgia
SPECIAL ORDERS
NUMBER A-134EG-19 30 April 1959
*406 1. Under provisions of 10 USC 672(d) each of the following named officers with his consent and the consent of the Governor of Tennessee is ordered to active duty in grade indicated for the number of days stated below unless sooner relieved, assigned 444th Ftr Intcp Sq, (ADC) Charleston Air Force Base, South Carolina with duty station at McGhee-Tyson Aprt, Knoxville, Tennessee. On effective date of duty officer will proceed from his home or temporary address of record as indicated to duty station. Officer will be relieved from active duty station in time to arrive at his home on date indicated. Active duty will commence at 0001 hours effective date and terminate at 2400 hours on date of release from active duty. Officer will revert to status in Tennessee ANG on the day subsequent to date of release from active duty. * * *

Since January 1958 the “scramble” operations at McGhee-Tyson Airport consist of an average of one flight a day or 30 flights a month.
22. Though the personnel of the Tennessee Air National Guard are civilian employees of the State of Tennessee, the following facts regarding them are true:
(a) All personnel are paid by the United States.
(b) All personnel wear the uniform of the United States Air Force.
(c) All personnel receive retirement and insurance benefits from the United States.
(d) All of the 31 pilots of the unit hold reserve commissions in the United States Air Force.
23. All of the jet aircraft, equipment, and physical facilities at McGhee-Tyson Airport which aré being used by *407 the Tennessee Air National Guard, are owned by the United States. In addition, the United States pays 75 percent of the operating expense of the Air National Guard Unit.
24. During the operation of flights by personnel of the Tennessee Air National Guard, the disturbance of plaintiffs’ enjoyment of their property, as heretofore described, has been of substantially the same character though of somewhat less degree.
25. In July or August 1957, some 6 months prior to the inactivation of Air Force operations at the airbase, negotiations were entered into with the plaintiffs for the acquisition by the United States of a clearance easement over the plaintiffs’ property for the sum of $8,500. The transaction was completed on December 10,1957, when the plaintiffs executed and delivered to the United States a warranty deed of clearance easement over their property for the sum of $3,500, which was paid to them on that date.
26. The value of plaintiffs’ property, prior to the beginning of flights of jet aircraft from McGhee-Tyson Airport in 1953, is not in dispute. Plaintiffs’ witnesses place such value at $28,000 and $29,000. The defendant concedes a value of $30,000.
27. It is believed that plaintiffs have suffered a reduction in the value of their property from low flights of jet aircraft, above and beyond that suffered by the public generally, to the extent of 50 percent of the value of such property.
CONCLUSION OP LAW
Upon the .foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiffs are entitled to recover, and it is therefore adjudged and ordered that plaintiffs recover of and from the United States the sum of fifteen thousand dollars ($15,000.00) plus an amount computed at a rate of four (4) percent per annum from the date of the taking, to date of payment, all as part of just compensation for the taking. Further proceedings will be held pursuant to Rule 38 (c) to determine the date of the taking.
It is further concluded that defendant is vested with a perpetual easement of flight over plaintiffs’ property at an *408 elevation of two hundred and fifty (250) feet or more above the ground with airplanes of any character.
In accordance with the opinion of the court and on a memorandum report of the commissioner as to the amount due thereunder, it was ordered on September 28, 1960, that judgment for the plaintiffs be entered for $15,000, with interest thereon at 4 percent per annum from' June 15, 1953 to date of payment.