Joe **ROBERTSON** and Addrue **Robertson**

v.

The **UNITED STATES**.

No. 393–62.

United States Court of Claims.

Nov. 12, 1965.

Reuel W. Little, Madill, Okl., attorney of record, for plaintiffs.

David D. Hochstein, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before LARAMORE, Acting Chief Judge, DURFEE, DAVIS and COLLINS, Judges, and WHITAKER, Senior Judge.

PER CURIAM.

This case was referred pursuant to Rule 57(a) to Trial Commissioner Wilson Cowen (now Chief Judge Cowen), with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in an opinion and report filed on May 28, 1964. The plaintiffs have excepted to the opinion and certain of the findings of fact. The parties have filed briefs and the case has been submitted to the court without argument of counsel. The court agrees with the commissioner's findings, his opinion and his recommended conclusion of law, as hereinafter set forth, and hereby adopts the same as the basis for its judgment in this case. Plaintiffs are therefore not entitled to recover and the petition is dismissed.

OPINION OF THE COMMISSIONER

This action was brought on December 11, 1962, to recover compensation of $47,000, representing the claimed diminution in value of plaintiffs' property in Grayson County, Texas, because of the alleged taking of an avigation easement caused by low and frequent flights of military jet aircraft operating from Perrin Air Force Base, Sherman, Texas.

The evidence shows that the Government, has taken an avigation easement over plaintiffs' land, and the defendant has admitted this in its brief. However, the defendant contends that the taking occurred more than 6 years prior to the filing of plaintiffs' petition on December 11, 1962. Thus, the primary issue for decision is whether the claim is barred by the statute of limitations, 28 U.S.C. §

2501. The actual issue is whether a new cause of action accrued in 1960 with the advent of F–102 jet aircraft at the base, from which the T–33 and F–86 fighter jets had been operating since 1953.

Perrin Air Force Base is located 10 miles north of Sherman, Texas, and, on July 17, 1952, was designated a permanent base. The base was used exclusively by propeller-driven aircraft until December 19, 1952, when the first jet-propelled aircraft were delivered. In February 1953, the first class of students began training in the flight of jet aircraft.

With the inception of jet aircraft operations at the base, it was necessary to construct two new runways of greater length. The first of these, known as the east North-South runway, was built in 1952 and is located about 1,000 feet west of the original north-south triangular runways that were used by propeller-driven planes. As the volume of jet air traffic increased, a new westerly North-South jet runway was completed in December 1953, and in January 1954, its use by jet aircraft commenced. The center line of this runway is parallel to and 1,000 feet west of the center line of the easterly North-South runway.

Both the easterly and westerly runways were 8,000 feet long until November 1962, when the easterly runway was extended 1,000 feet to the south. The easterly runway, the only jet runway until January 1954, was used for approximately 67 percent of the takeoffs and landings because the ground control approach equipment at the base could be used only on this runway. The easterly runway is also used more than the westerly runway because it is nearer to the hangars and other installations.

Plaintiffs' property is divided into two tracts, both of which are located in a noncongested area as defined by the Civil Aeronautics Authority [now the Federal Aviation Agency]. Tract A, which comprises 315 acres, is used primarily as pastureland for the grazing of cattle, but

there are also six producing oil wells on the land. From 1953 to the present, the highest and best use of this land has been for the grazing of livestock and the production of oil. The north boundary line of the tract is 2,400 feet south of the south end of the east North-South runway as extended, and the major portion of the tract is located within the approach zone to and take-off zone from this runway. Tract B is located approximately one-quarter of a mile southwest of Tract A. It is plaintiffs' home place, and, as shown in the findings of fact, is a well improved piece of property with a centrally heated and air-conditioned frame residence, tenant house, windmill, storage tanks, a shop, a barn, and several stock tanks. Seventy acres of the tract are used for the production of small grains and the remainder is pastureland. Since 1953, the highest and best use of this tract has been as an owner-operated stock farm. The north boundary line of Tract B is 7,350 feet south of the south end of the west North-South runway, and the residence is 8,410 feet from the end of that runway. The major portion of the tract is located within the approach zone to and the take-off zone from the west North-South runway.

There is no evidence in the record tending to show that the propeller-driven aircraft operating from Perrin Air Force Base prior to 1953 interfered substantially with the use and enjoyment of plaintiffs' land. Therefore, flights of such aircraft will be disregarded for the purposes of this action.

The major types of jet aircraft which have operated from Perrin Air Force Base in substantial numbers since 1953 are the T-33 Jet Trainer, the F-86 Sabre Jet, and the F-102 Delta Dagger. All three aircraft are single-engine, jet-powered, fighter planes, which are extremely noisy when taking off from the runways because at such times they operate at full military power. The T-33 weighs 15,000 pounds and is not equipped with an afterburner; the Sabre Jet weighs 19,725 pounds and is equipped

with an afterburner; and the F-102 weighs 31,560 pounds and is also equipped with an afterburner. The noise, vibration, and disturbance created by low overflights of the F-86 and the F-102 are considerably greater than that generated by the Jet Trainer. The F-102 is larger and more powerful than the F-86, has better performance with greater maneuverability, a shorter take-off roll, and a dramatically more rapid rate of climb.

The Jet Trainers have operated continuously at the base since February 1953, and the F-86 was used there in substantial numbers between February 1953 and June 1962. In May 1960, F-102 jet fighters were first assigned to Perrin and gradually replaced the F-86's, which were not used after June 1962.

The traffic pattern at Perrin Air Force Base has remained the same for the past 10 years, and flight regulations there require a jet on takeoff to climb to an altitude of 500 feet above the ground before executing a mandatory turn to the east or west.

The direction in which takeoffs or landings are made at the base depends upon the direction of the prevailing winds and a 10-year study of the wind there indicates that more than 70 percent of the takeoffs were made toward the south over or in the direction of plaintiffs' property, and about 30 percent of the landings were made toward the north over plaintiffs' property.

On an average day at the base and under normal operating conditions, the T-33 has a take-off roll of about 4,000 feet; the F-86, with afterburner, has a take-off roll of approximately 5,000 feet; and the F-102, with the use of an afterburner, has a take-off roll of 3,000 feet before becoming airborne. In the majority of takeoffs made to the south over plaintiffs' property, the T-33's and F-86's passed over plaintiffs' property at a height of from 200 to 300 feet above the terrain. On the other hand, the F-102, with its shorter take-off roll and more rapid rate of climb, usually reaches an altitude of 800 feet above the ground

before passing over Tract A, and from 1,200 feet above the terrain when passing over Tract B on takeoffs toward the south. Normally and on most occasions, the F–102 attains an altitude of more than 500 feet before it reaches Tract B on takeoffs toward the south, will make a 30-degree turn to the right and will not pass over any part of Tract B. The operation of jet aircraft, particularly the F–86 and the F–102 planes, is affected by weather conditions and by pilot technique. On extremely hot days and on infrequent occasions, both the F–86 and F–102 pass over plaintiffs' Tract B at lower altitudes than indicated above.

The noise and disturbance created by the three types of jets when flying over or near plaintiffs' property while landing toward the north was considerably less than the noise made on takeoffs because the aircraft always land under reduced power and without using afterburners. Since the F–102 has a steeper glide path for the final approach to the runway than either the Jet Trainer or the Sabre Jet, it passes over plaintiffs' land prior to landing at lower altitudes than either of the other two aircraft when the visual flying rules are used and is, therefore, somewhat noisier. When the radar ground control approach is used in landing, all three aircraft pass over plaintiffs' property at an average altitude of approximately 375 feet.

During 1953 and 1954, the volume of air traffic at Perrin Air Force Base was as much as 14,000 landings and takeoffs within a month, including low approaches, and as many as 40 "touch-and-go" maneuvers per day. Since 1955, there have been approximately 700 to 750 jet operations per day during the normal flight schedule, which occurs between the hours of 8:00 A.M. and midnight on Monday through Friday. The training schedule consists of 20 working days a month, there being little flying activity on Saturdays, Sundays and holidays.

In an effort to meet defendant's affirmative defense that the claim is barred by the statute of limitations, plaintiffs contend that defendant did not take an avigation easement by virtue of the overflights of the T–33's and F–86's and that the statute did not begin to run until after May 1960, when the F–102's were used in substantial numbers. In the alternative, plaintiffs assert that the low flights over plaintiffs' property by the T–33's and F–86's amounted only to a partial taking and that they are entitled to compensation for the additional taking after the F–102's began regular flights over their property at low altitudes.

It is clear from the record that there is a substantial difference in the noise and disturbance caused by the flights of T–33's as compared with those of the F–86's and the F–102's, and it may be concluded that the overflights of the Jet Trainers did not constitute a taking of an avigation easement over plaintiffs' property. However, the greater weight of the evidence shows that there were numerous, regular and frequent takeoffs of F–86's with the afterburners in use over plaintiffs' property at altitudes well below 500 feet above the ground in the period from February 1953 to December 11, 1956. These regular and frequent intrusions into the air space above plaintiffs' land interfered seriously and substantially with the use and enjoyment of such lands for some time prior to December 11, 1956.

The record contains no scientific data from which a comparison can be made of the noise intensities of the F–86 and the F–102 during takeoff with afterburners on. Although there is some evidence to the contrary, the greater weight of the evidence shows that the noise and disturbance created by the F–86 and the F–102 on takeoffs is so loud and disturbing that the human ear can barely distinguish any difference in the intensity of the sound created by these aircraft when flying over plaintiffs' land at low altitudes.

From the above recitation of facts and from the more detailed find-

ings of fact, the following conclusions are evident:

(1) The frequency of flights by jet aircraft at Perrin Air Force Base over plaintiffs' property at altitudes below 500 feet was not increased by the phasing out of the F–86 and its gradual replacement by the F–102.

(2) The most substantial and serious interference with the use and enjoyment of plaintiffs' property occurred while jet aircraft were taking off toward the south over plaintiffs' property with afterburners engaged. Since the F–102 consistently achieved a substantially higher altitude on takeoffs over plaintiffs' property than the F–86, takeoffs of the F–102's over such property at altitudes below 500 feet occurred only irregularly and infrequently. Plaintiffs have not shown by a preponderance of the evidence that the interference with the use and enjoyment of their property was increased to any significant extent when the F–102 type of aircraft began flying in substantial numbers at the base or that the value of their property was further diminished as a direct result of such low overflights of the F–102 jets.[4]

(3) The regular and frequent takeoffs of F–86 jets with afterburners in use over plaintiffs' lands at altitudes below 500 feet constituted a direct and immediate interference with the enjoyment and use of plaintiffs' lands for at least a year before December 11, 1956, the beginning of the 6-year period preceding the filing of the petition. Brin v. United States, 159 Ct.Cl. 332 (1962). Cf. Bacon v. United States, 295 F.2d 936, 155 Ct.Cl. 441 (1961).

This court has previously held that flights of the F–86, with such regularity and frequency as in this case, resulted in the taking of an avigation easement over the property involved in the particular case. Wilson v. United States, 151 Ct.Cl.

271 (1960); Wright v. United States, 279 F.2d 517, 150 Ct.Cl. 386 (1960); Matson v. United States, 171 F.Supp. 283, 145 Ct.Cl. 225 (1959). In Matson, in which the facts were quite similar to the case at bar, F–86's began operating from the air base in August 1953, the F–102's being assigned to the base 3 years later. The court held that the taking occurred in August 1953, when regular and frequent flights of the F–86 occurred.

■ By declarations of taking filed, respectively, on December 31, 1954, and June 7, 1962, in the United States District Court for the Eastern District of Texas, the United States took clearance easements over Tracts A and B which gave the Government the right to clear and keep clear of obstructions the air space above the glide angle plane extending southerly from the air base over those portions of plaintiffs' tracts lying within the approach zones to the two runways. The glide angle plane covered by these clearance easements ranged from 18 to 70 feet above ground level. Plaintiffs point to these clearance easements and argue that the Government's action in obtaining them indicated its intention to lower the flight angle and thus to fly its planes over plaintiffs' property at lower altitudes. Plaintiffs' conclusion does not necessarily follow, there being a distinction between the altitudes delineated by the clearance easement and the flight angle normally used. The clearance easement (sometimes called the glide angle) is not the angle at which planes normally approach the runway, but is the lowest possible angle at which aircraft can fly in approaching the runway; it is the minimum angle of approach consistent with any degree of safety. Dick v. United States, 169 F.Supp. 491, 144 Ct.Cl. 424 (1959); Highland Park, Inc. v. United States, 161 F.Supp. 597, 142 Ct.Cl. 269

---

1. In the late spring of 1959, or almost a year before any F–102's arrived at the base, plaintiffs insulated the windows of their residence on Tract B in an effort to decrease the noise and disturbance created by jet aircraft flying over their house at low altitudes.

(1958); Herring v. United States, 162 F.Supp. 769, 142 Ct.Cl. 695 (1958). The difference between the minimum glide angle described in the clearance easement and the normal glide slope can be attributed to a safety margin designed to provide for emergencies.

Although the taking of the clearance easements reduced the value of plaintiffs' property, plaintiffs have been compensated for such damage in the condemnation proceedings.

From what has been said above, it follows that the defendant had taken an avigation easement for the flight of its aircraft over plaintiffs' property at altitudes below 500 feet more than 6 years prior to December 11, 1962, the date the petition was filed, and that plaintiffs' claim is barred by 28 U.S.C. § 2501.